[Cite as *State v. Carter*, 2017-Ohio-5573.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 104653**

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# ALTON O. CARTER

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-598676-A

**BEFORE:** Jones, J., E.A. Gallagher, P.J., and Stewart, J.

**RELEASED AND JOURNALIZED:** June 29, 2017

**ATTORNEY FOR APPELLANT**

Jonathan N. Garver
The Brownhoist Building
4403 St. Clair Avenue
Cleveland, Ohio 44103


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

BY: Steven McIntosh
        Brett Hammond
Assistant County Prosecutors
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

LARRY A. JONES, SR., J.:

{¶1} Defendant-appellant Alton Carter ("Carter") appeals his assault and kidnapping convictions, which were rendered after a jury trial. We affirm.

## I. Procedural and Factual History

{¶2} On August 28, 2015, a Cuyahoga County Grand Jury charged Carter in a five-count indictment as follows: Count 1, rape; Count 2, attempted rape; Count 3, felonious assault; Count 4, kidnapping; and Count 5, misdemeanor assault. With the exception of Count 5, misdemeanor assault, the counts contained notices of prior conviction (Counts 1, 2, and 4); repeat violent offender specifications ("RVO," Counts 1, 2, and 4); sexually violent predator specifications (Counts 1, 2, 3, and 4); and sexual motivation specifications (Counts 3 and 4). At his arraignment, Carter was declared indigent and a court-appointed attorney was assigned to his case.

{¶3} Defense counsel and the state engaged in pretrial proceedings, which included the exchange of discovery. During the course of the pretrial proceedings, Carter, pro se, filed a motion to suppress evidence and a motion for speedy trial; the trial court never ruled on the motions and, therefore, they are deemed denied.[1] The case proceeded to a jury trial[2] in May 2016, during which the following facts were adduced.

{¶4} On the evening in question, the victim, G.R., was at Tucker's Casino, a karaoke bar, celebrating her birthday; Carter was also at the bar, with two people, one of whom was a former high school classmate of G.R.'s. G.R. and Carter were acquainted

---

[1] *State ex rel. Nash v. Fuerst*, 8th Dist. Cuyahoga No. 99027, 2013-Ohio-592, ¶ 8.

[2] The sexually violent predator specifications were tried to the bench.

with each other — they had previously met on a dating website and had had a brief, intimate relationship. At the time of the incident giving rise to this case, they were no longer dating, however, because the victim had ended the relationship. G.R. testified that when she saw Carter in the bar, she approached him to say hello to him and her former classmate and talked with them for a few minutes while she waited for a friend to arrive. After her friend arrived, G.R. hung out with her and mingled with other people she knew in the bar.

{¶5} The victim testified that she and her friend left the bar after closing time, around 2:30 a.m., and Carter was leaving at the same time. She invited Carter, along with some others, to do shots from a bottle of tequila she had in the trunk of her car; Carter accepted the invitation. During the course of the parking lot drinking, however, Carter appeared ready to leave — the friends he had been with had already left.

{¶6} While the group was in the parking lot, Carter closed G.R.'s trunk, not realizing that her car keys were in there. Carter helped her get the trunk open, then asked G.R. for a ride home and she told him no. She knew that he lived with his grandmother, whose house was just around the corner from the bar, and thought that Carter should walk home.

{¶7} Carter became angry, and an argument ensued, with some in the group blaming him for the trunk incident. Carter, irate and profane, then began arguing with the victim and her friend. Carter asked G.R. for a ride a second time, she told him no again, which further upset him. G.R. testified that, fearful of Carter, she maced him in the face. According to G.R., as she was in her car attempting to leave, Carter reached in and struck her in the face.

**{¶8}** G.R. drove to her apartment building in Cleveland Heights; her friend followed in her car to make sure G.R. made it home safely. When G.R. arrived in front of her apartment building, she and her friend stopped to talk about what had transpired. After their conversation, when G.R. attempted to restart her car, the car would not start. Her friend called her father, who arrived and "jumped" G.R.'s car. Once the car was running, the friend and her father left, and G.R. drove her car into the garage of her apartment building.

**{¶9}** The victim testified that after she parked her car, and as she was approaching her apartment building, Carter appeared "out of nowhere" and approached her, angry about what had occurred earlier at Tucker's Casino. She told him to leave and that they would talk about it later when he was sober, but he continued to argue with her. G.R. testified that she was right by a neighbor's window, and she knew that neighbor tended to be up late, so she screamed for him to call 911, and attempted to run back into the parking garage, thinking she could escape in her car. G.R. testified that Carter grabbed her wrist, but she was able to free herself from him and continue to the garage. The victim testified that Carter followed her into the garage, where he choked her, digitally penetrated her vagina, and attempted to anally rape her. She maced him again, and he ran out of the garage, where he encountered the police who had arrived on the scene by that time.

**{¶10}** The neighbor testified that he saw G.R. and an unknown man at the back door of the apartment building and thought he saw a struggle. He then observed both of them walking towards the garage and thereafter lost sight of them. He testified that it did not appear that the man was pulling the victim into the garage.

{¶11} One of the responding officers, Jason Moze ("Officer Moze"), testified that he encountered Carter, who was "calm," but "disheveled," with mace on his face and dirt and cobwebs on his clothing and shoes. The officer testified that he found similar cobwebs in the parking garage. The victim had her pants and underpants pulled down to her ankles, and was "irate" and "screaming" that she had been raped; Carter denied raping her, however.

{¶12} Officer Moze placed Carter in the back of his patrol car. The officer testified that Carter was not under arrest at that time because he still needed to determine the "full story," and the scene was chaotic because of the apparent animosity between G.R. and Carter. Initially, G.R. told the officer that she and Carter did not know each other; later, however, she admitted that they did.

{¶13} G.R. went to the hospital, where a sexual assault examination was performed on her. The sexual assault nurse examiner ("SANE") who conducted the examination testified at trial. The SANE testified that the victim told her that Carter grabbed her and dragged her by her arms, while choking, and shaking her, and hitting her head against a wall. She also told the nurse that Carter had attempted to digitally penetrate her vagina, but she was not sure if he had been successful. The SANE testified that she did not find any evidence of injury to G.R.'s neck or vagina. She did observe "minor" injuries, that could have been caused by G.R.'s account of the events, but for which the nurse was unable to render an opinion as to their cause.

{¶14} The state also presented the testimony of two forensic scientists from the Ohio Bureau of Criminal Investigation ("BCI"). One of the scientists examined a specimen collected by the nurse as part of the rape kit. The scientist tested the victim's

underwear and determined that it was positive for semen. The other scientist conducted two tests on the swabs from the victim's underwear, and concluded, based on the results of one of the tests, that Carter was excluded as the source of the DNA, and was unable to reach a conclusion based on the results of the other test. Further, testing of vaginal and bi-lateral buttock samples taken from the victim did not reveal the presence of any male DNA.

{¶15} The other scientist testified about her conclusions regarding Carter's "touch DNA" on the victim. Specifically, she tested neck swabs taken from G.R. and found that Carter's touch DNA was present. She testified that the amount of Carter's DNA found on G.R.'s neck seemed a "little unlikely that it would just be from casual rubbing up against, but, again, I can't say for certain one way or the other."

{¶16} Detective Thomas DeCaro from the Cleveland Heights Police Department was assigned to investigate the case. The detective interviewed Carter, who at the time was under arrest and in police custody at the police station. The interview video was played for the jury at trial.

{¶17} During the interview, Carter told the detective that the victim had maced him while they were at Tucker's Casino, so he walked to her apartment to talk to her about why she had done that. Carter told the detective that he arrived at her building as she was at the door to the building; he denied waiting there for her to arrive. Carter said that the victim mentioned wanting to get something to eat and headed back towards her car. Carter said, "okay, then you can take me home."

{¶18} According to Carter, he was walking around to the passenger side of the victim's car when the police approached and yelled "stop." The victim then shouted "he

tried to rape me." Carter stated that when he turned around to look at the victim, she had her pants down. He stated that he had no idea how her pants got down. Carter told the detective that his clothing was dirty because he had fallen at Tucker's Casino after G.R. had maced him.

{¶19} At the conclusion of the state's case, the defense moved for a Crim.R. 29 judgment of acquittal as to Count 2, attempted rape and Count 3, felonious assault. The motion was denied in toto as to the attempted rape, and it was granted in part as to the felonious assault. Specifically, the charge of "serious physical harm" was removed from the count, thereby making it a charge of misdemeanor assault, to which the specifications did not apply and, therefore, were dismissed. The defense did not present any witnesses.

{¶20} After its deliberations, the jury found Carter guilty of Count 3, misdemeanor assault and Count 4, kidnapping. The matter was referred to the adult probation department for a presentence investigation. Prior to sentencing, Carter filed a motion to set aside the verdict and for a Crim.R. 29 judgment of acquittal; the trial court denied the motion. After the presentence investigation was completed, Carter was sentenced to six years on the kidnapping conviction, to be served concurrently to a six-month sentence on the assault conviction. He was labeled a Tier II sex offender and advised of postrelease control.

## II. Assignments of Error

{¶21} Carter now presents the following nine assignments of error for our review:

I. The trial court violated appellant's rights under the Fifth, Sixth, and Fourteenth Amendments of the Constitution of the United States by allowing the state to present evidence of statements elicited from appellant by police officers after he was accused of rape and while he was being detained by police officers without first advising him of his constitutional

rights and obtaining a valid waiver from him.

II.    The trial court committed plain error by failing to give a jury instruction on the lesser included offense of kidnapping.

III.    The trial court committed plain error by permitting the state's forensic scientist to speculate on whether touch DNA found on the alleged victim's neck supported the allegation of assault (choking/strangulation).

IV.    The trial court committed prejudicial error and interfered with appellant's right to confront his accusers by prohibiting defense counsel from questioning the SANE nurse about matters set forth in the victim's medical records.

V.    The trial court committed plain error by allowing the investigating officer to editorialize and express personal opinions while testifying about statements made by appellant.

VI.    The trial court committed prejudicial error by allowing the investigating officer to provide hearsay testimony concerning statements allegedly made by a barmaid at Tucker's Casino.

VII.    Appellant was denied his right to effective assistance of counsel.

VIII.    The evidence was insufficient to support appellant's conviction for kidnapping.

IX.    Appellant's conviction for kidnapping is against the manifest weight of the evidence.

### III.    Law and Analysis

**Carter's Statements while Detained**

{¶22} In his first assignment of error, Carter contends that the trial court violated his constitutional rights by allowing the state to introduce evidence of statements he made to the police at the scene of the incident.    Carter, however, did not raise this issue in the

trial court.[3]   It is well established that if a motion is not filed raising a particular suppression issue, that issue is waived.   *See, e.g., Xenia v. Wallace*, 37 Ohio St.3d 216, 524 N.E.2d 889 (1988), paragraph one of the syllabus; *State v. Mixner*, 12th Dist. Warren No. CA2001-07-074, 2002-Ohio-180, ¶ 3.   Regardless of the fact that Carter waived the issue by failing to raise it in the trial court, there is no merit to his claim.   Officer Moze, who questioned Carter at the scene, testified that at the time he questioned him he was not under arrest; rather, his questioning was for investigative purposes so that he could determine what had transpired.   *See State v. Gaston*, 110 Ohio App.3d 835, 842, 675 N.E.2d 526 (11th Dist.1996).   The first assignment of error is overruled. **Failure to Instruct Jury on Abduction**

{¶23} For his second assignment of error, Carter contends that the trial court erred by not instructing the jury on abduction, a lesser included offense of kidnapping.[4]   Carter did not seek the instruction at the trial court level and, therefore, has waived all errors except plain error on this issue.   *State v. Majid*, 8th Dist. Cuyahoga No. 96855,

---

[3]As mentioned, Carter did file a motion to suppress, pro se, but the motion did not raise the issue he attempts to now set forth.   Further, at the time Carter filed his suppression motion, he was represented by counsel.   Although a defendant has the right to counsel or the right to act pro se, a defendant does not have a right to "hybrid representation."   *State v. Mongo*, 8th Dist. Cuyahoga No. 100926, 2015-Ohio-1139, ¶ 13, citing *State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227, paragraph one of the syllabus, and *State v. Thompson*, 33 Ohio St.3d 1, 6-7, 514 N.E.2d 407 (1987). The right to counsel and the right to act pro se "'are independent of each other and may not be asserted simultaneously.'" *Mongo* at *id.*, quoting *Martin* at *id.*   Thus, when a criminal defendant is represented by counsel and there is no indication that defense counsel joins in the defendant's pro se motion or otherwise indicates a need for the relief sought by the defendant pro se, the trial court cannot properly consider the defendant's pro se motion.   *State v. Wyley*, 8th Dist. Cuyahoga No. 102899, 2016-Ohio-1118, ¶ 9.

[4]*See State v. Simmons*, 8th Dist. Cuyahoga No. 96208, 2011-Ohio-6074, ¶ 42 ("Abduction is a lesser included offense of kidnapping.").

2012-Ohio-1192, ¶ 86; Crim.R. 52(B). "Plain error as to jury instructions is proven when the outcome of the trial would have been different but for the alleged error." *Majid* at *id.*, citing *State v. Campbell*, 69 Ohio St.3d 38, 630 N.E.2d 339 (1994). Carter contends that because he was acquitted of the rape and attempted rape charges, there was a reasonable probability that the outcome of the trial would have been different if the jury had been instructed on abduction, which, unlike kidnapping, does not contain a sexual motivation element.

{¶24} Carter's argument presupposes that the acquittal on the sex charges, but conviction on the kidnapping charge, was inconsistent. But the kidnapping statute "punishes certain removal or restraint done with a certain purpose and the eventual success or failure of the goal is irrelevant." *State v. Taylor*, 8th Dist. Cuyahoga No. 100315, 2014-Ohio-3134, ¶ 30; *see also State v. Matthieu*, 3d Dist. Mercer Nos. 10-02- 04 and 10-02-05, 2003-Ohio-3430, ¶ 17; *State v. Moore*, 8th Dist. Cuyahoga No. 60334, 1992 Ohio App. LEXIS 2534, 8 (May 14, 1992). Thus, the jury's finding of not guilty on the rape and attempted rape charges was "not in any sense a finding that there was no intent or purpose to commit" kidnapping. *Taylor* at *id.*; *see also Matthieu* at *id.* and *Moore* at *id.*

{¶25} As mentioned, we review the lack of instruction on abduction for plain error. Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Phillips*, 74 Ohio St.3d 72, 83, 656 N.E.2d 643 (1995). Upon review, we do not find plain error. The jury was instructed that in order to find Carter guilty of kidnapping, they had to find that the sexual motivation element of the crime had been proven beyond a reasonable

doubt. By finding him guilty of kidnapping, the jury thereby found that there was a sexual motivation element to his conduct; it is, therefore, unlikely that an abduction without a sexual motivation instruction would have changed the outcome of the trial. Apparently the jury believed that Carter held G.R. in the garage against her will with the intent to commit a sexual crime, but did not believe that the sexual crime was effectuated, which was consistent with the DNA evidence. Therefore, Carter's second assignment of error is overruled.

**Touch DNA Testimony**

{¶26} In his third assigned error, Carter contends that it was error to allow the forensic scientist's "speculative" testimony that the amount of Carter's DNA on the victim's neck was "more consistent with a prolonged exposure or a prolonged touching than just a casual brush up against." We again review for plain error, because Carter did not object to the testimony at trial.

{¶27} Evid.R. 702 governs the admission of expert testimony and provides in relevant part as follows:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

{¶28} The Ohio Supreme Court has held that trial courts should "favor the admissibility of expert testimony whenever it is relevant and the criteria of Evid.R. 702 are met." *State v. Nemeth*, 82 Ohio St.3d 202, 207, 694 N.E.2d 1332 (1998). Upon review, the scientist's testimony was relevant to the state's claim that Carter choked the victim.

{¶29} Further, it met the requirements of Evid.R.702. Carter's contention that the testimony was impermissible because the scientist could not testify "for certain" that the amount of DNA equated to a choking is without merit. Expert witnesses in criminal cases can testify in terms of possibility rather than in terms of a reasonable scientific certainty or probability. *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 129. The treatment of such testimony involves an issue of sufficiency, not admissibility; they are matters of weight for the jury. *Id.*

{¶30} Expert DNA evidence testimony is similarly treated. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 78. Thus, it has likewise been held that questions regarding the reliability of DNA evidence go to the weight of the evidence rather than its admissibility, and that the "trier of fact, the judge or jury, can determine whether DNA evidence is reliable based on the expert testimony and other evidence presented." *State v. Pierce*, 64 Ohio St.3d 490, 501, 597 N.E.2d 107 (1992).

**{¶31}** In light of the above, there was no error, plain or otherwise, in allowing the forensic scientist's touch DNA evidence testimony, and the third assignment of error is overruled.

**Confrontation of the SANE**

**{¶32}** Carter contends in his fourth assignment of error that the trial court impermissibly interfered with his constitutional right to confront his accusers by limiting his questioning of the SANE. The limitation occurred when defense counsel sought to have the nurse read a particular portion of the victim's compiled medical records. The state objected on the ground that counsel was asking the nurse to read from a document that she did not create. The trial court called a sidebar, so that it could look at the portion of the document counsel sought to have the SANE read. After conferencing about it off the record, the court sustained the state's objection. Defense counsel later attempted to question the nurse on apparently the same portion of the victim's record, prompting the trial court to state "No. No. No, for all the reasons that I gave you at sidebar. We still have unauthenticated material."

**{¶33}** To establish error regarding the issue of excluded evidence, an appellant must show that the substance of the excluded evidence was made known to the court by proffer or was apparent from the context within which questions were asked. Evid.R. 103(A); *Campbell v. Johnson*, 87 Ohio App.3d 543, 622 N.E.2d 717 (2d Dist.1993). Although the issue was discussed at sidebar with the court, the sidebar conference was off the record, there was no proffer made about what the defense sought to have the SANE testify about, and it is not clear from the context what the testimony might have been. Lacking a proffer in the record, we would be relegated to conjecture, which we decline to

do. Thus, Carter has waived any purported error in this regard. *State v. Brooks*, 44 Ohio St.3d 185, 195, 542 N.E.2d 636 (1989).

{¶34} The fourth assignment of error is overruled.

**Investigating Detective's Personal Opinion Testimony**

{¶35} Carter's fifth assignment of error relates to testimony of the investigating detective, Thomas DeCaro, which we review for an abuse of discretion.[5] Specifically, during Detective DeCaro's testimony, he testified as to portions of the video recording of his interview with Carter. The detective testified that in the beginning of the interview Carter was "irate and upset," but that he eventually did "calm down a little bit." The assistant prosecuting attorney asked the detective if Carter then cooperated with the interview, to which the detective responded,

> [t]o a point. * * * when we're asking him questions, he was kind of like, it's best to say, talking around the answers, * * * we couldn't really get a clear answer from him. * * * When you're taught interviewing, one of the techniques you kind of learn is people mentally try and distance themselves from an incident * * *.

{¶36} Defense counsel objected to the answer, and the court overruled the objection.

{¶37} Further, in testifying about what Carter told him transpired on the night and morning of the incident, Detective DeCaro related that Carter told him that he wanted to talk to the victim about her macing him at the bar because that embarrassed him. The detective testified that Carter's account did not make sense to him, and he provided the

---

[5]The admission or exclusion of evidence lies within the trial court's sound discretion. *State v. Bey*, 85 Ohio St.3d 487, 489-490, 709 N.E.2d 484 (1999). Thus, we will not disturb a trial court's evidentiary ruling absent an abuse of discretion. *Krischbaum v. Dillon*, 58 Ohio St.3d 58, 66, 567 N.E.2d 1291 (1991).

following testimony: "Let me get this straight. You get in an argument or some kind of altercation, you get maced in the face, and your intent is to walk a mile uphill to that person's residence and ask them why you were maced in the face? That doesn't seem like a good idea, especially at four in the morning."

{¶38} The defense objected, and the court responded that it was trying to determine whether what the detective was testifying to was what he actually told Carter or if he was testifying about his personal opinion of what Carter told him. Detective DeCaro responded, "[w]e were kind of reviewing [the events] with him, and he agreed that that was the account." The assistant prosecuting attorney continued questioning Detective DeCaro about what Carter told him about the incident and the detective testified that he found it "kind of strange." The defense objected again, and this time the court admonished Detective DeCaro as follows: "No. No. I don't need reactions from the police [as] to what [Carter] said. You're here to tell us what [Carter] said. Stop the reactions."

{¶39} It is true that a police officer's opinion that an accused is being untruthful is inadmissible. *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 122. For example, the following has been held improper: a detective's testimony that the defendant was "being very deceptive." *Id.* at ¶ 123; a detective's testimony that he "was not getting the complete truth" from the defendant and that "there was some deception there." *State v. Carpenter*, 12th Dist. Clermont No. CA2012-06-041, 2013-Ohio-1385, ¶ 23; and a detective's personal opinion as to the truth of a defendant's statements. *State v. Vanek*, 11th Dist. Lake No. 2002-L-130, 2003-Ohio-6957, ¶ 37. The concern is the likelihood of a jury being influenced by a police officer's opinion regarding a witness's

credibility. *State v. Withrow*, 11th Dist. Ashtabula No. 2011-A-0067, 2012-Ohio-4887, ¶ 47.

**{¶40}** But even though opinion testimony regarding the truthfulness of a witness is inadmissible, a witness may give "testimony in the form of opinions or inferences * * * which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Evid.R. 701. "Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." Evid.R. 704.

**{¶41}** Thus, construing Evidence Rules 701 and 704, the Ohio Supreme Court has observed that "[t]estimony expressing an opinion on whose version is more likely to be true would certainly aid the jury in reaching its conclusion." *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, 820 N.E.2d 302, ¶ 27. This court has held that an officer is not vouching for a witness' credibility by explaining the investigative procedure he or she followed and, therefore, the testimony is "admitted for proper purposes." *State v. Vales*, 8th Dist. Cuyahoga No. 81788, 2003-Ohio- 6631, ¶ 33, citing *In re: Shubutidze*, 8th Dist. Cuyahoga No. 77879, 2001 Ohio App. LEXIS 996 (Mar. 8, 2001); *see also State v. Axson*, 8th Dist. Cuyahoga No. 81231, 2003-Ohio-2182, ¶ 67.

**{¶42}** In regard to the first instance of Detective DeCaro testifying about Carter's level of cooperation, that was properly admitted as part of the detective's testimony regarding the investigative procedure he used. As mentioned, portions of the interview the police conducted of Carter were played for the jury. The detective testified that initially Carter was "irate and upset." The assistant prosecuting attorney then asked if

Carter subsequently cooperated — a question not directed at determining Carter's credibility.

{¶43} In regard to the second instance of the detective testifying that he found Carter's story "strange" and that walking to G.R.'s apartment at 4:00 a.m. was "not a good idea," that was arguably improper opinion testimony on Carter's credibility. But as soon as the court determined that was, in fact, improper opinion testimony, it admonished Detective DeCaro that his testimony was improper and, in its instructions to the jury, the court informed the jury that they were to disregard any testimony that the court did not allow. A presumption exists that a jury follows the instructions given to it by the trial court. *State v. Glover*, 10th Dist. Franklin No. 07AP-832, 2008-Ohio-4255, ¶ 80.

{¶44} On this record, there was no abuse of discretion and Carter's fifth assignment of error is therefore overruled.

**Investigating Detective's Testimony about Barmaid's Statements**

{¶45} Carter's sixth assignment of error challenges more of Detective DeCaro's testimony, this time as violating his right to confrontation by providing hearsay testimony about what a barmaid at Tucker's Casino told him. The barmaid did not testify at trial.

{¶46} Specifically, the assistant prosecuting attorney asked the detective who he spoke to during the course of his investigation. The detective replied that, among others, he talked to the "barmaid who was present at the time. She was actually a reluctant witness, but I was able to get ahold of her * * * and she gave me a corroborating account." The defense objected, and the court overruled the objection. The detective continued, "[s]he was * * * like I said, she wasn't really a cooperative witness." The court then interrupted, saying, "[o]kay. Hang on. Stop. Let's have a new question."

**{¶47}** In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that pursuant to the Confrontation Clause of the Sixth Amendment to the United States Constitution, "[t]estimonial statements of witnesses absent from trial [can be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Id.* at 59. However, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at fn. 9, citing *Tennessee v. Street*, 471 U.S. 409, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985). For example, "where statements are offered to explain an officer's conduct while investigating a crime, such statements are not hearsay." *State v. Blevins*, 36 Ohio App.3d 147, 149, 521 N.E.2d 1105 (10th Dist.1987).

**{¶48}** But the admission of out-of-court statements to explain police conduct in an investigation has the potential for abuse. *Id.* For example, the Tenth Appellate District warned trial courts against allowing prosecuting attorneys to use police officer testimony to introduce unfairly prejudicial out-of-court statements, including testimony that connects the defendant to the crime at issue:

> It is well-established that, where statements are offered into evidence to explain an officer's conduct during the course of investigating a crime, such statements are generally not hearsay. There are limits, however, to this general rule because of the great potential for abuse and potential confusion to the trier of fact. For example, a prosecutor may attempt to use a police officer's testimony regarding his investigative activities as a pretext to introduce highly prejudicial out-of-court statements, while claiming the

statements are being offered merely to explain the police officer's conduct, rather than for their truth. Furthermore, when the statements connect the accused with the crime charged, they should generally be excluded.

(Citations omitted.) *Id.* at ¶ 11.[6]

{¶49} Here, although the assistant prosecuting attorney did not ask Detective DeCaro to testify as to the barmaid's statements, the detective did so in his response. And although the trial court initially overruled the defense's objection, it quickly reversed itself, realizing that the detective was giving improper hearsay testimony. But the limited amount of hearsay testimony that Detective DeCaro did give about the barmaid — that she gave a "corroborating account" — was not prejudicial to Carter. Specifically, the detective never testified whose story the barmaid corroborated — the victim's or Carter's — and it is not clear from the context of his testimony to whom he was referring. Thus, on this record, his one-time reference to the barmaid's statement was harmless error. The sixth assignment of error is overruled.

**Ineffective Assistance of Counsel Claim**

{¶50} In his seventh assignment of error, Carter contends that his trial counsel was ineffective based on his failure to: (1) request an abduction jury instruction; (2) file a motion to suppress; (3) object to inadmissible and improper evidence; and (4) failure to use impeachment evidence. Carter further contends that the cumulative effect of the

[6] *See also State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, 964 N.E.2d 442, ¶ 26 (6th Dist.) ("the well-worn phrase 'not offered for the truth of the matter asserted' is not a talismanic incantation that opens the door to everything said outside the courtroom. For an extrajudicial statement of this type, a secondary assessment under Evid.R. 403(A) is required. The trial court must consider whether the risk that the jury will prejudicially misuse the content for its truth exceeds the probative value of the statement for the nonhearsay purpose.") (Citations omitted.)

errors deprived him of a fair trial.

**{¶51}** Reversal of a conviction for ineffective assistance of counsel requires a defendant to show that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Defense counsel's performance must fall below an objective standard of reasonableness to be deficient in terms of ineffective assistance of counsel. *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989). Moreover, the defendant must show that there exists a reasonable probability that, were it not for counsel's errors, the results of the proceeding would have been different. *State v. White*, 82 Ohio St.3d 16, 23, 693 N.E.2d 772 (1998).

**{¶52}** In evaluating a claim of ineffective assistance of counsel, a court must give great deference to counsel's performance. *Strickland* at 689. "A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *State v. Pawlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175, ¶ 69.

### 1. Failure to Request Abduction Instruction

**{¶53}** It is well-established that the decision of whether to request a lesser-included offense jury instruction is deemed trial strategy. *State v. Griffie*, 74 Ohio St.3d 332, 333, 658 N.E.2d 764 (1996) ("Failure to request instructions on lesser-included offenses is a matter of trial strategy and does not establish ineffective assistance of counsel"). Specifically, it is a recognized trial strategy to forego lesser-included offense instructions as an election to seek acquittal rather than to invite conviction on a lesser offense. *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980) (even if

trial counsel's strategy is questionable, tactical decisions do not amount to ineffective assistance of counsel); *see also State v. Jones*, 8th Dist. Cuyahoga No. 80737, 2003-Ohio-4397, ¶ 8.

**{¶54}** In light of the above, trial counsel was not ineffective for failing to request an abduction instruction.

### 2.    Failure to File Suppression Motion

**{¶55}** As mentioned in addressing Carter's first assignment of error, Carter made statements to the police at the scene.   Specifically, Officer Moze testified that when he first encountered Carter at the scene, Carter told him that he "had nothing to do with this."  While Carter was saying that, the victim came out and said that Carter had raped her; Carter told him that he did not do that and he did not know why her pants were down. The officer then questioned Carter to find what was going on, and Carter told him about being maced and then walking to the victim's residence to talk to her about why she had done that.   The officer testified that at that time, Carter was not under arrest, he was just trying to "put the puzzle together."

**{¶56}** Carter now contends that his counsel was ineffective for not filing a motion to suppress his statements on the ground that he was not Mirandized prior to being questioned.   We disagree.   *Miranda*[7] warnings must be provided when a defendant is subject to a custodial interrogation.   A custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."   *Miranda v. Arizona*, 384 U.S. at 444,

---

[7]*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Here, the statements Carter now contends should have been suppressed were in response to the officer's questioning of him when he arrived on the scene and was trying to determine what had happened. "General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact finding process is not affected by our holding." *Id.* at 477. Thus, the *Miranda* warnings were not required for Officer Moze's questioning of Carter.

### 3. Failure to Object to Testimony

{¶57} Carter also complains that his counsel was ineffective for not objecting to the testimony (1) of the nature of the contact that produced the touch DNA on the victim's neck; (2) the detective's opinion of Carter's account of the events; and (3) the police officer's testimony regarding the barmaid's statement.

{¶58} In regard to the touch DNA testimony, as already discussed, the testimony was relevant to the state's claim that Carter choked the victim and it met the requirements of Evid.R. 702; the lack of objection, therefore, was not ineffective assistance of counsel.

{¶59} In regard to the detective's opinion testimony, the first instance, in which he testified that Carter's reason for why he was at the victim's residence did not "seem like a good idea, especially at four in the morning," *was* objected to by counsel. The second instance, when the detective testified that he found Carter's story "strange" was improper opinion testimony on Carter's credibility, as we discussed above. But, despite counsel's lack of objection, as soon as the court determined that it was, in fact, improper opinion testimony, it admonished Detective DeCaro that his testimony was improper. As such, Carter's ineffective assistance of counsel claim on this ground fails, because the court on its own found the testimony improper and halted it.

{¶60} And, regarding the barmaid's testimony, as we previously mentioned, defense counsel *did* initially object to the testimony, and the trial court overruled the objection. But, again, once the court realized that the testimony was improper, it quickly reversed itself.

### 4. Failure to Use Impeachment Evidence

{¶61} Carter further contends that his trial attorney was ineffective because he failed to use impeachment evidence. Specifically, Officer Moze's encounter with Carter at the scene was captured on the officer's body camera. During opening statement, Carter's counsel told the jury that they would have the opportunity to see the video from the camera, which captured the police's interactions with Carter, the victim, and the neighbor who called the police. The portion of the video relative to the neighbor was not played, and Carter contends that it contained impeachment evidence on it, and that counsel was ineffective for not using it. At trial, the neighbor testified that he had not made any reports to the police concerning G.R. prior to this incident. The alleged impeachment evidence was the neighbor allegedly telling the police that he had to call the police on the victim before.

{¶62} Carter now contends on appeal that "[a]fter the State had rested, [his] trial counsel indicated a desire to play Officer Moze's body cam video to impeach [the neighbor]." Carter contends that counsel was ineffective because he did not impeach the neighbor during cross-examination of the neighbor. The record indicates that this situation occurred because of a misunderstanding, and after our review, we find that it did not constitute the ineffective assistance of counsel.

{¶63} Specifically, defense counsel indicated that he believed he and the assistant

prosecuting attorney agreed that the video from the officer's body camera, including the portion showing the police's interaction with the neighbor would be played by the state during Officer Moze's testimony, who testified after the neighbor testified. Thus, defense counsel believed the impeachment evidence would "be brought in intrinsically" through the officer's testimony. The state did not play that portion of the video, however, when it questioned Officer Moze, and defense counsel stated that, although he did not believe he was intentionally misled, he was "told one thing and something else happened."

{¶64} The assistant prosecuting attorney stated that he "thought [he] made it clear that [the state] had an issue playing [the neighbor's] part * * * because [the neighbor] would testify * * * and playing that video through Officer Moze would clearly be hearsay of a witness." The assistant prosecuting attorney stated that he had not been trying to mislead defense counsel or the court, and that he believed defense counsel was not trying to mislead the court either, and the whole incident must have been a "miscommunication."

{¶65} On this record, counsel was not ineffective, and furthermore, the outcome of the trial would not have been different if the neighbor had been impeached on his testimony that he had not previously called the police regarding the victim.

## 5. Cumulative Effect

{¶66} In *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), the Ohio Supreme Court recognized the doctrine of cumulative error. *Id.* at paragraph two of the syllabus. Under this doctrine, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous

instances of trial court error does not individually constitute cause for reversal. *Id.* at 196-197; *see also State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, 23 N.E.3d 1023, ¶ 258.

**{¶67}** The court has recognized that multiple errors, when aggregated, may violate a defendant's right to a fair trial, even when those errors are determined to be harmless when separately considered. *State v. Madrigal*, 87 Ohio St.3d 378, 397, 721 N.E.2d 52 (2000). To find cumulative error, we first must find multiple errors committed at trial, and secondly, we must conclude that a reasonable probability exists that the outcome of the trial would have been different but for the combination of the harmless errors. *Id.* at 398.

**{¶68}** Upon review, as discussed above, there were not multiple errors committed at trial. Thus, the cumulative error doctrine is inapplicable. The seventh assignment of error is overruled.

**Sufficiency of Evidence: Kidnapping and Tier II Sex Offender**

**{¶69}** In his eighth assignment of error, Carter contends that the evidence was insufficient to support the kidnapping conviction and, thus, by extension, the Tier II sex offender label. We disagree.

**{¶70}** Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In determining whether the evidence is legally sufficient to support a conviction, "'[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v.*

*Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, 919 N.E.2d 190, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. A verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact. *State v. Treesh*, 90 Ohio St.3d 460, 484, 739 N.E.2d 749 (2001).

**{¶71}** In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence). Further, the testimony of "one witness, if believed by the jury, is enough to support a conviction." *State v. Strong*, 10th Dist. Franklin No. 09AP-874, 2011-Ohio-1024, ¶ 42.

**{¶72}** Carter contends that the evidence was insufficient to support the kidnapping conviction because the "essential element of purpose to engage in sexual activity was insufficient as a matter of law." Carter cites that he was acquitted of the rape and attempted rape in support of his claim. But as mentioned, the kidnapping statute "punishes certain removal or restraint done with a certain purpose and the eventual success or failure of the goal is irrelevant." *Taylor*, 8th Dist. Cuyahoga No. 100315, 2014-Ohio-3134, ¶ 30. Here, the state presented evidence, namely the victim's testimony, that Carter held her against her will in the garage and made unwelcomed sexual advances toward her. That testimony was sufficient to support the kidnapping charge and, therefore also the Tier II sexual offender label.

**{¶73}** The eighth assignment of error is overruled.

**Weight of the Evidence: Kidnapping and Tier II Sex Offender**

**{¶74}** In his final assignment of error, Carter contends that his kidnapping conviction and Tier II sex offender label were against the manifest weight of the evidence.

**{¶75}** When presented with a manifest-weight challenge, an appellate court may not merely substitute its view for that of the trier of fact but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d 380 at 387, 678 N.E.2d 541, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin* at *id.*

**{¶76}** Carter contends that the kidnaping conviction was against the manifest weight of the evidence because G.R.'s allegation "just didn't make sense and it was riddled with inconsistencies and contradictions." Although we may consider the credibility of the witnesses in a manifest weight of the evidence challenge, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *State v. Cattledge*, 10th Dist. Franklin No. 10AP-105, 2010-Ohio-4953, ¶ 6, quoting *Seasons Coal Co.,*

*Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Accordingly, we afford great deference to the jury's determination of witness credibility.

**{¶77}** After review, we decline to disturb the jury's determination — this is not the exceptional case in which the evidence weighs heavily against the conviction. The ninth assignment of error is overruled.

**{¶78}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

LARRY A. JONES, SR., JUDGE

EILEEN A. GALLAGHER, P.J., and
MELODY J. STEWART, J., CONCUR