[Cite as *State v. Hughkeith*, 2023-Ohio-1217.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                                  :

    Plaintiff-Appellee,                :

    v.                                         :

No. 111647

CHRISTOPHER HUGHKEITH, JR.,     :

    Defendant-Appellant.           :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 13, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-652331-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kevin R. Filiatraut, Assistant Prosecuting Attorney, *for appellee.*

Kimberly Kendall Corral and Gabrielle M. Ploplis, *for appellant.*

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendant-appellant, Christopher Hughkeith ("Hughkeith"), appeals from his convictions following a bifurcated trial. He raises the following assignments of error for review:

1. The trial court erred in denying appellant's motion for jury view.

2. The trial court erred in permitting the charges to go to the jury as the state failed to produce sufficient evidence to prove beyond reasonable doubt that appellant was not acting in self-defense and further failed to prove the elements of felonious assault of James White.

3. The trial court erred in failing to create a record instructing appellant of his right to remain silent.

4. The trial court erred in displaying judicial bias against the defendant.

5. The trial court erred when it instructed on the duty to retreat.

6. Appellant was denied the effective assistance of counsel where trial counsel failed to object to improper jury instruction.

7. Appellant was denied the effective assistance of counsel where trial counsel failed to request that the jury be instructed as to lesser included offenses.

8. The trial court erred in prohibiting appellant from providing complete trial testimony in his defense, thereby infringing on his Fifth and 14th Amendment right to due process.

9. The state engaged in prosecutorial misconduct which materially infected the trial with unfairness.

{¶ 2} After careful review of the record and relevant case law, we affirm Hughkeith's convictions and sentence.

## I. Procedural and Factual History

{¶ 3} In August 2020, Hughkeith was named in an eight-count indictment, charging him with aggravated murder in violation of R.C. 2903.01(A) (Count 1); murder in violation of R.C. 2903.02(B) (Count 2); felonious assault in violation of R.C. 2903.11(A)(1) (Count 3); attempted murder in violation of R.C. 2923.02 and

2903.02(A) (Count 4); felonious assault in violation of R.C. 2903.11(A)(2) (Count 5); attempted murder in violation of R.C. 2923.02 and 2903.02(A) (Count 6); felonious assault in violation of R.C. 2903.11(A)(2) (Count 7); and having weapons while under disability in violation of R.C. 2923.13(A)(3) (Count 8). Counts 1-7 contained one- and three-year firearm specifications.

{¶ 4} The indictment stemmed from allegations that Hughkeith fired gunshots at the victims, Michael Powell ("Powell"), James White ("White"), and Romeo Robinson ("Robinson"), resulting in the death of Powell. Counts 1, 2, and 3 of the indictment pertained to Powell. Counts 4 and 5 pertained to White. Counts 6 and 7 pertained to Robinson.

{¶ 5} The matter proceeded to a bifurcated trial in May 2022. Upon the agreement of the parties, Counts 1-7 were tried to a jury and the having weapons while under disability charge was tried to the bench. Relevant to this appeal, the following facts were adduced at trial.

{¶ 6} On August 8, 2020, Hughkeith and his codefendant, Charles Caldwell ("Caldwell"), arrived at the Buckeye Plaza shopping center located in Cleveland, Ohio. Hughkeith, who was wearing a white t-shirt and a Cincinnati Reds baseball hat, exited the driver's side of his silver sedan at approximately 2:33 p.m. He and Caldwell walked up and down the plaza sidewalk while Caldwell spoke on his cell phone.

{¶ 7} Shortly after Hughkeith exited his vehicle, Powell, Robinson, and White arrived at the shopping center in a black SUV and parked next to Hughkeith's silver

sedan. Powell, who was wearing a white t-shirt, dark colored jeans, and a blue bandana, exited the black SUV and entered a Mr. Hero's restaurant at approximately 2:35 p.m. White, who was wearing a red t-shirt and a blue baseball hat, exited the rear passenger's door of the black SUV and entered a Little Caesar's pizzeria located next door to Mr. Hero. Robinson, who was wearing a red jumpsuit, remained inside the black SUV.

{¶ 8} Hughkeith entered the Mr. Hero approximately one minute after Powell. Caldwell remained outside the restaurant and continued to speak on his cell phone. Surveillance-video footage from the interior of the Mr. Hero captured Hughkeith and Powell's movements inside the restaurant. Therein, Hughkeith walked to the food counter and stood in line behind Powell. When Powell completed his food order, he walked to the beverage station and Hughkeith moved to the front of the counter to place his order. At this time, Powell began exchanging words with Hughkeith.

{¶ 9} During the verbal altercation, Powell lifted his t-shirt to reveal a firearm in his waistband. He then brandished the firearm and took several steps towards Hughkeith. Powell held the firearm in his right hand for approximately 40 seconds before placing the weapon back in his waistband. Shortly thereafter, Powell brandished the firearm a second time. On this occasion, Hughkeith turned his back to Powell and walked towards the restaurant's exit door. Although the surveillance cameras inside the Mr. Hero contained audio, it is difficult to interpret the specific nature of the initial exchange of words. However, at approximately 2:38:38 p.m.,

Powell can be heard stating to Hughkeith, "[W]hen I blow your face off," and "I don't give a f***." In addition, at 2:39:18 p.m., Powell can be heard stating, "[W]here's your gun at, where's your gun at though." Finally, Powell warned Hughkeith to "go get a gun" as Hughkeith was walking out of the restaurant.

{¶ 10} The interaction between Hughkeith and Powell inside Mr. Hero lasted less than three minutes. Hughkeith stood at the counter with his hands behind his back during the entirety of the exchange. Hughkeith exited the restaurant before getting his food at approximately 2:39:32 p.m. Initially, Powell remained inside the restaurant. He was visibly agitated, continued to curse, and carefully watched Hughkeith's movements through the restaurant windows.

{¶ 11} When Hughkeith exited the restaurant, he stood near the front entrance for approximately 20 seconds before he and Caldwell began walking towards Hughkeith's silver sedan. Near the same time Hughkeith arrived at his vehicle, Powell exited the Mr. Hero's restaurant and immediately headed towards his black SUV, which was parked directly next to Hughkeith's vehicle. As Powell was walking in Hughkeith's direction, he motioned towards White, who had just exited the Little Caesar's pizzeria, and began pointing at Hughkeith. Powell reached the vicinity of his black SUV at approximately 2:40:30 p.m. At that time, Hughkeith suddenly fired a handgun at Powell.

{¶ 12} Once the first shot was fired, Hughkeith came around the back of the black SUV and fired successive shots at Powell. Powell immediately fell to the ground and did not return fire. In the midst of the shooting, White removed a

firearm from the front of his waistband and returned fire. Robinson then exited the passenger's side of the black SUV and started firing shots at Hughkeith. During this exchange of fire, Hughkeith, Powell, and White, each sustained gunshot injuries. Exterior surveillance cameras captured the parties' movements in the parking lot. Relevant to this appeal, the surveillance footage does not show Powell reach for a firearm or make a movement towards his waistband during the shooting.

{¶ 13} Hughkeith and Caldwell fled the scene on foot once Robinson began firing his weapon. When Hughkeith and Caldwell were no longer in sight, Robinson entered the driver's side of the black SUV and began pursuing Hughkeith in the vehicle. Thereafter, Caldwell returned to the silver sedan and left the parking lot before the authorities arrived. Powell remained motionless on the ground.

{¶ 14} Surveillance-video footage obtained from a grocery store and a plasma center located near the Buckeye Plaza captured Hughkeith's movements as he attempted to flee on foot. Hughkeith attempted to run inside the grocery store but was prevented from doing so by a store employee. He then ran through the parking lot towards the plasma center, which is located on East 116th Street. When Hughkeith emerged from the plasma center at approximately 2:42 p.m., the black SUV pulled up beside him and fired additional gunshots from the passenger's side window. Hughkeith dove to the ground but sustained additional gunshot wounds. Hughkeith then retreated to a nearby home, where he was picked up by Caldwell in the silver sedan.

{¶ 15} White also fled from the parking lot after the shooting. An unknown witness reported seeing an individual matching White's description run into the backyard of an abandoned home located on East 114th Street in Cleveland, Ohio. When police responded to the abandoned home, they "found a firearm and some blood and [a] magazine in the brush or grass of that home on East 114th." (Tr. 1027.) White later returned to the scene of the shooting. He spoke with officers and was transported to the hospital for a gunshot wound to his abdomen.

{¶ 16} Paramedics arrived at the scene at approximately 2:47 p.m. While Powell was being attended to by EMS personnel, an EMS worker removed a firearm from Powell's waistband and placed it next to Powell's body. (Tr. 1044.) Ultimately, Powell was pronounced dead as a result of his gunshot injuries.

{¶ 17} At approximately 3:56 p.m. on August 8, 2020, Hughkeith arrived at Fairview Hospital in a black Jeep SUV. He checked into the hospital using a false name and was treated for various gunshot wounds.

{¶ 18} Detective David Borden ("Det. Borden") of the Cleveland Police Department was assigned as the lead investigator into the shooting. In the course of his investigation, Det. Borden participated in the collection of evidence at the scene of the shooting, submitted evidence for forensic and ballistics testing, and obtained DNA samples from Hughkeith, White, Robinson, and Caldwell. Det. Borden also reviewed surveillance footage from various businesses located near the scene of the shooting. Det. Borden testified that the surveillance footage was critical to his investigation because it confirmed that (1) Hughkeith was the first person to

fire a gunshot, and (2) Hughkeith fired the fatal gunshots that resulted in Powell's death. (Tr. 1114.)

{¶ 19} Luciano Miranda ("Miranda") testified that he was formally employed by Signal 88 Security, a private security company that patrols the Buckeye Plaza shopping center. On August 8, 2020, Miranda was patrolling the parking lot in a marked vehicle when he heard "a series of six or seven [gun] shots." (Tr. 643.) Miranda immediately got on his radio and reported the shots fired. During the shooting, Miranda observed a male, later identified as Powell, fall to one knee in the parking lot. When the shooting stopped, Miranda approached Powell, who was now lying motionless on the ground, and waited with him until the ambulance arrived. Miranda confirmed that when Powell was turned over, there was a 9 mm handgun tucked in his waistband. A dash-camera attached to Miranda's patrol vehicle captured the incident as it transpired in front of Miranda. Relevant portions of the video were played for the jury.

{¶ 20} Dr. David Dolinak ("Dr. Dolinak"), a deputy medical examiner, performed the autopsy on Powell. Dr. Dolinak testified that Powell was shot a total of five times. He sustained gunshot wounds to his upper back, right upper arm, left upper arm, mid-chest, and left hip. Dr. Dolinak opined that the gunshot wound to Powell's back was fatal based on the substantial damage caused to his aorta and lungs. Dr. Dolinak testified that Powell's toxicology report showed the presence of marijuana and a blood-alcohol level of .127. Dr. Dolinak concluded, to a reasonable degree of scientific certainty, that Powell's manner of death was a homicide based

upon the circumstances surrounding his death and the nature of the gunshot wounds inflicted.

{¶ 21} Detective Troy Edge ("Det. Edge") of the Cleveland Police Department testified that he was assigned to investigate the scene of the shooing. In the course of his investigation, Det. Edge collected and photographed the evidence recovered from the Buckeye Plaza parking lot, including a Taurus 9 mm handgun, a FHN 9 mm handgun, spent 7.62 x 39 cartridge casings, spent 9 mm cartridge cases, and items of clothing. Additional items were recovered near the roadway, including four spent 9 mm casings, a Glock 9 mm handgun, a magazine with ten live rounds, and a face mask. Det. Edge also observed blood spatter at various locations on the scene. In total, the investigators recovered three firearms and more than 40 spent casings. During an unrelated investigation involving Robinson, the police seized a Draco arms rifle that was believed to have fired the 7.62 x 39 casings found at the scene of the shooting.

{¶ 22} Lisa Moore ("Moore"), a forensic analyst employed by the Cuyahoga County Regional Forensic Science Laboratory, testified that she performed DNA testing on various items found at the scene of the shooting. In relevant part, Moore confirmed that Hughkeith's DNA was consistent with samples taken from (1) the Cincinnati Reds baseball hat recovered from the parking lot, (2) swabs of blood discovered in the lobby of Simon's Supermarket, (3) swabs of blood discovered on the sidewalk near the roadway, (4) the FHN 9 mm handgun recovered from the parking lot, and (5) the magazine from the FHN 9 mm handgun. In turn, White's

DNA was consistent with the samples taken from (1) a blue hat and a blood-stained t-shirt recovered from the parking lot, (2) the Glock 9 mm handgun found near East 114th Street, and (3) the magazine from the Glock 9 mm handgun. Powell's DNA was consistent with the samples recovered from (1) the Taurus 9 mm handgun found on his person, and (2) the magazine from the Taurus 9 mm handgun. Finally, Caldwell's DNA was consistent with the samples recovered from (1) the grip and trigger area of the FHN 9 mm handgun that also contained Hughkeith's DNA.

{¶ 23} James Kooser ("Kooser"), a firearm and toolmark expert employed by the Cuyahoga County Regional Forensic Science Laboratory, testified that he performed ballistic testing on the firearms and spent casings recovered from the scene of the shooting. Kooser testified that the FHN 9 mm containing Hughkeith's DNA fired 14 of the spent casings; the Glock 9 mm handgun containing White's DNA fired five casings; the Draco rifle recovered from Romeo Robinson fired 20 spent casings, and four spent casings were fired from an unknown 9 mm handgun. (Tr. 972-974, 990.) With respect to Powell's firearm, Kooser confirmed that the Taurus 9 mm handgun did not fire any of the spent casings recovered from the scene. Kooser further indicated that the Taurus handgun was rendered inoperable during the incident because it was struck by a bullet.

{¶ 24} At the conclusion of the state's case, defense counsel moved for a dismissal of Counts 1-7 pursuant to Crim.R. 29, which the trial court denied. (Tr. 1185.)

{¶ 25} Hughkeith testified on his own behalf. Hughkeith stated that on August 8, 2020, he dropped his children off at their mother's home and drove to the Buckeye Plaza shopping center to eat lunch with his friend, Caldwell. Hughkeith testified that he and Caldwell initially went into Little Caesar's pizzeria but decided to walk next door to eat at a Mr. Hero's restaurant. While waiting in line inside the Mr. Hero's restaurant, Hughkeith was confronted by Powell, who told Hughkeith to "be prepared when you go outside." (Tr. 1207.) Hughkeith testified that he had never met Powell previously and did not understand why Powell became confrontational. Hughkeith stated that when he asked Powell to repeat what he had stated, Powell suddenly pulled a gun out of his waistband and "kept saying, where your gun at? Where your gun at?" (Tr. 1210.) When Hughkeith responded that "I don't play with guns," Powell stated "Go get a gun. Go get your gun. I'm going to come outside and blow your face off." (Tr. 1209.) Hughkeith testified that he was scared and immediately left the restaurant. Powell followed Hughkeith out of the restaurant and Hughkeith overheard Powell state, "Fitting to come outside. I'm fitting to blow your f*****g face off." (Tr. 1213.) Hughkeith viewed Powell's comment as a threat that could be carried out by the firearm in Powell's waistband.

{¶ 26} During the confrontation in the parking lot, Hughkeith realized that a second man, later identified as White, was with Powell. Hughkeith testified that the two men were walking towards him, and White started to "reach for his waistband." (Tr. 1218.) Hughkeith also observed Powell reach for the same gun that was previously brandished inside the restaurant. Hughkeith believed the men were

"coming for [him]." (Tr. 1218.) He was "scared" and believed his life was "in danger." (Tr. 1218.) Based on the movements of Powell and White, Hughkeith shot Powell.

{¶ 27} Throughout his direct examination, Hughkeith maintained that he acted in self-defense and had no choice but to shoot Powell. Hughkeith explained that he "was in immediate danger" and was certain Powell would have shot and killed him had he not shot Powell first. (Tr. 1219-1220.) Hughkeith asserted that he only had two seconds to make the decision to fire the gun in his possession. Hughkeith maintained that he was attempting to leave the scene to avoid a confrontation but was prevented from doing so because Powell "[came] out right behind me yelling, get the chopper, let's get him." Hughkeith explained that he interpreted Powell's statement to "get the chopper" was a reference to "A big gun. Assault rifle. A big gun." (Tr. 1216.)

{¶ 28} Hughkeith testified that he sustained gunshot wounds to his back, arm, leg, and knee. Hughkeith was later transported to Fairview hospital by his sister. Hughkeith confirmed that he provided a false name at the hospital because he had a warrant out for his arrest. He further admitted that he lied to the police about the source of his gunshot wounds and stated that he was shot during a robbery on the west-side of Cleveland.

{¶ 29} At the conclusion of trial, the jury found Hughkeith guilty of murder, with one- and three-year firearm specifications (Count 2), felonious assault, with one- and three-year firearm specifications (Count 3), and felonious assault, with

one- and three-year firearm specifications (Count 5). The trial court then found Hughkeith guilty of having weapons while under disability (Count 8). Hughkeith was found not guilty of all remaining counts and accompanying specifications.

{¶ 30} At the time of sentencing, the trial court found Counts 2 and 3 were allied offenses of similar import that merged for the purposes of sentencing. The state elected to proceed with sentencing on Count 2, and the trial court sentenced Hughkeith to 15 years to life on Count 2, to run consecutively to a three-year term of imprisonment on the corresponding firearm specification. Hughkeith was also sentenced to an indefinite prison term of five to seven- and one-half years on Count 5, to run consecutively to a three-year term of imprisonment on the corresponding firearm specification. Finally, the trial court sentenced Hughkeith to two years in prison on Count 8. The sentence imposed on each base offense and firearm specification were ordered to run consecutively, for an aggregate prison term of "life imprisonment with parole eligibility after serving 28 full years of imprisonment."

{¶ 31} Hughkeith now appeals from his convictions and sentence.

## II. Law and Analysis

### A. Motion for Jury View

{¶ 32} In the first assignment of error, Hughkeith argues the trial court erred in denying his motion for jury view. Hughkeith contends that viewing the crime scene would have assisted the jury in "understanding and assessing the evidence presented at trial and would have provided clarity as to [his] defense."

{¶ 33} R.C. 2945.16 authorizes a trial court to allow the jury to view the place at which a material fact occurred. The statute provides, in pertinent part:

> When it is proper for the jurors to have a view of the place at which a material fact occurred, the trial court may order them to be conducted in a body, under the charge of the sheriff or other officer, to such place, which shall be shown to them by a person designated by the court.

{¶ 34} The purpose of a jury view is to assist the trier of fact in understanding and applying the evidence offered at trial. *Monus v. Day*, 7th Dist. Mahoning No. 10 MA 35, 2011-Ohio-3170, ¶ 47. "The jury view is not part of the presentation of evidence; the jury is not permitted to gather evidence at the jury view, and only a representative of the court may address the jury about the subject of the jury view during the jury view." *Hetzer-Young v. Elano Corp.*, 2016-Ohio-3356, 66 N.E.3d 234, ¶ 88 (2d Dist.).

{¶ 35} "The granting or denial of a motion for a jury view is within the discretion of the trial court and the court's decision will only be reversed when an abuse of that discretion is established." *Mayfield Hts. v. Barry*, 8th Dist. Cuyahoga No. 82159, 2003 Ohio 4403, ¶ 27, citing *State v. Montalvo*, 47 Ohio App.2d 296, 353 N.E.2d 855 (7th Dist.1974).

{¶ 36} An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. In other words, "[a] court abuses its discretion when a legal rule entrusts a decision to a judge's discretion and the judge's exercise of that discretion is outside of the

legally permissible range of choices." *State v. Hackett*, 164 Ohio St.3d 74, 2020-Ohio-6699, 172 N.E.3d 75, ¶ 19.  This court has held that an abuse of discretion may be found where a trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, 892 N.E.2d 454, ¶ 15 (8th Dist.).  When applying the abuse of discretion standard, a reviewing court may not substitute its judgment for that of the trial court.  *Vannucci v. Schneider*, 2018-Ohio-1294, 110 N.E.3d 716, ¶ 22 (8th Dist.).

{¶ 37} On April 29, 2022, Hughkeith moved the court to order a jury view "of the area encompassing the scene of the alleged criminal conduct."  In the motion, Hughkeith argued that it was "vital for the trier of fact to view these areas to be able to comprehensively evaluate and understand the testimony of the witnesses expected to testify in this trial."  The motion was denied on May 2, 2022.

{¶ 38} Based on the breadth of evidence presented at trial, we find nothing in the record to support Hughkeith's assertion that the trial court acted outside the legally permissible range of choices by denying the motion for a jury view.  In this case, the state introduced surveillance-video footage from a number of businesses located within the Buckeye Plaza.  Collectively, this evidence permitted the jury to view Hughkeith's conduct before, during, and after his initial confrontation with Powell inside the Mr. Hero's restaurant, as well as the shooting that transpired in the parking lot shortly thereafter.  The video footage provided multiple angles of the interaction between Hughkeith and Powell, and select portions contained audio

functions.  This evidence provided context to Hughkeith's interaction with Powell inside the restaurant and permitted the jury to fully assess the parties' movements at the time the first gunshot was fired.  Hughkeith did not challenge the authenticity of the video footage or whether it depicted an accurate representation of the incident.  Under these circumstances, we find the trial court did not abuse its discretion by denying Hughkeith's request for a jury view pursuant to R.C. 2945.16.

{¶ 39} The first assignment of error is overruled.

## B.  Sufficiency of the Evidence

{¶ 40} In the second assignment of error, Hughkeith argues the state failed to produce sufficient evidence to disprove his assertion of self-defense.  He further contends that his felonious-assault conviction, as charged in Count 5 of the indictment, is supported by insufficient evidence.

{¶ 41} A sufficiency challenge requires a court to determine whether the state has met its burden of production at trial and to consider not the credibility of the evidence but whether, if credible, the evidence presented would sustain a conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).  The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.  *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991), citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶ 42} "'Proof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value.'" *State v. Rodano*, 2017-Ohio-1034, 86 N.E.3d 1032, ¶ 35 (8th Dist.), quoting *State v. Zadar*, 8th Dist. Cuyahoga No. 94698, 2011-Ohio-1060, ¶ 18. Although circumstantial evidence and direct evidence have obvious differences, those differences are irrelevant to the probative value of the evidence, and circumstantial evidence carries the same weight as direct evidence. *Id.*, citing *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. Further, circumstantial evidence is not only sufficient, ""but may also be more certain, satisfying, and persuasive than direct evidence."" *Id.* at ¶ 36, quoting *State v. Hawthorne*, 8th Dist. Cuyahoga No. 96496, 2011-Ohio-6078, quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960).

### 1. Felonious Assault (Count 5)

{¶ 43} We begin by addressing Hughkeith's assertion that the state failed to produce sufficient evidence to support the felonious-assault offense pertaining to the victim, James White. As stated, Count 5 of the indictment charged Hughkeith with felonious assault in violation of R.C. 2903.11(A)(2). The statute provides that "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."

{¶ 44} "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such

circumstances probably exist." R.C. 2901.22(B). "Physical harm" means "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). Finally, a "deadly weapon" is "any instrument, device, or thing capable of inflicting death, and designed or specifically adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2901.22(A).

{¶ 45} On appeal, Hughkeith argues "the state failed to produce any evidence showing that [he] shot and injured White in the first instance." Hughkeith contends that "the evidence produced at trial merely demonstrates physical harm suffered by White – this is wholly inadequate to support [the felonious assault] conviction." We find no merit to Hughkeith's position.

{¶ 46} Viewing the evidence in the light most favorable to the state, we find any rational trier of fact could have found that the state presented sufficient evidence to satisfy the essential elements of felonious assault beyond a reasonable doubt. It is common knowledge that a firearm is an inherently dangerous instrumentality, use of which is reasonably likely to produce serious injury or death. *State v. Widner*, 69 Ohio St. 2d 267, 270, 431 N.E.2d 1025 (1982). Thus, this court has consistently held that "shooting a gun in a place where there is risk of injury to one or more persons supports the inference that the offender acted knowingly." *State v. Hunt*, 8th Dist. Cuyahoga No. 93080, 2010-Ohio-1419, ¶ 19, citing *State v. Brooks*, 44 Ohio St.3d 185, 192, 542 N.E.2d 636 (1989); *see also State v. Ivory*, 8th Dist. Cuyahoga No. 83170, 2004-Ohio-2968, ¶ 6. In this case, the record reflects that Hughkeith brandished his firearm and fired it repeatedly in the direction of Powell and White.

As a result of this conduct, Powell and White each sustained gunshot injuries. The jury had the opportunity to hear the investigating officer's testimony concerning the location of the discovered shell casings. The jury was also provided the opportunity to view the surveillance-video footage of the incident, which permitted the jury to assess White's proximity to Hughkeith's line of fire at the time Hughkeith discharged his weapon. *See State v. Burns*, 8th Dist. Cuyahoga No. 99782, 2014-Ohio-303, ¶ 15 ("[A] reasonable jury could infer that [the victims] were 'in the line of fire' at the time defendant discharged his weapon.").

{¶ 47} Under these circumstances, a reasonable juror could conclude that Hughkeith knowingly caused White physical harm by means of a deadly weapon, i.e., an operable firearm. Accordingly, we find the evidence was sufficient to convict Hughkeith of felonious assault (Count 5) in violation of R.C. 2903.11(A)(2).

## 2. The Affirmative Defense of Self-Defense

{¶ 48} Within this assignment of error, Hughkeith also suggests the state failed to produce sufficient evidence to prove beyond a reasonable doubt that he did not act in self-defense. Apart from the felonious-assault conviction discussed above, Hughkeith does not challenge the sufficiency of the evidence supporting an essential element of his convictions. Rather, he broadly asserts that the state failed to disprove his claim that he fired his gun in self-defense.

{¶ 49} A self-defense claim includes the following elements:

> (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that

his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.

*State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002).

{¶ 50} In a criminal trial taking place prior to March 28, 2019, the effective date of 2018 Am.Sub.H.B. No. 228 ("H.B. 228"), a defendant claiming the affirmative defense of self-defense had the burden of proving the foregoing elements of the defense by a preponderance of the evidence. *See former* R.C. 2901.05(A), 2008 Sub.S.B. No. 184; *State v. Brooks*, Slip Opinion No. 2022-Ohio-2478, ¶ 23 (discussing former versions of R.C. 2901.05). However, H.B. 228 amended R.C. 2901.05, and since March 28, 2019, the burden regarding self-defense has been as follows:

> A person is allowed to act in self-defense * * *. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense * * *, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense * * *.

R.C. 2901.05(B)(1).

{¶ 51} Contrary to Hughkeith's characterization of the applicable standard of review, the Ohio Supreme Court has reiterated that "[t]he plain language of R.C. 2901.05(A) reflects that self-defense is still an affirmative defense and that the burden of production is still on the defendant." *State v. Messenger*, Slip Opinion No. 2022-Ohio-4562, ¶ 21. Thus, "a defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense." *Id*. at ¶ 25. "[I]f the defendant's

evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden," and the state must then disprove self-defense. *Id.* at ¶ 25. In that case, "the sufficiency-of-the-evidence standard of review applies to [the defendant's] burden of production and a manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion." *Id.* at ¶ 26.

{¶ 52} Based on the foregoing, we find Hughkeith's challenge to the sufficiency of the evidence insofar as it invokes self-defense is inappropriate. *See State v. Canankamp*, 3d Dist. Auglaize No. 2-22-02, 2023-Ohio-43, ¶ 18, citing *State v. Bagley*, 3d Dist. Allen No. 1-13-31, 2014-Ohio-1787, ¶ 10, and *State v. Vasquez*, 10th Dist. Franklin No. 13AP-366, 2014-Ohio-224, ¶ 52. *See also Messenger* at ¶ 27 (finding "the Tenth District correctly declined to review the state's rebuttal of self-defense for sufficiency of the evidence"); *State v. Messenger*, 2021-Ohio-2044, 174 N.E.3d 425, ¶ 44 (10th Dist.) ("[S]ufficiency of the evidence is not the proper framework to review whether the state proved the absence of self-defense.").

{¶ 53} Nevertheless, our conclusion does not leave Hughkeith without an avenue to challenge the state's proof relative to his claim of self-defense. Viewed in its entirety, Hughkeith's discussion concerning the resolution of his self-defense claim constitutes a challenge to the manifest weight of the evidence. Accordingly, we will consider Hughkeith's argument that the state failed to prove he did not act

in self-defense as a challenge to the manifest weight of the evidence. *See Messenger*, 2021-Ohio-2044, 174 N.E.3d 425, at ¶ 45 (10th Dist.), citing *State v. Ferrell*, 2020-Ohio-6879, 165 N.E.3d 743, ¶ 54 (10th Dist.), citing *State v. Kurtz*, 10th Dist. Franklin No. 17AP-382, 2018-Ohio-3942, ¶ 21.

{¶ 54} In contrast to a sufficiency argument, a manifest-weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12, citing *Thompkins*, 78 Ohio St.3d at 390, 678 N.E.2d 541 (1997). When considering a defendant's claim that a conviction is against the manifest weight of the evidence, the appellate court functions as a "thirteenth juror" and may disagree "with the factfinder's resolution of * * * conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The appellate court examines the entire record, weighs the evidence and all reasonable inferences that may be drawn therefrom, considers the witnesses' credibility and determines whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.* at 387, quoting *Martin* at 175.

{¶ 55} As previously discussed, the state had the burden of disproving Hughkeith's self-defense claim beyond a reasonable doubt. *Messenger* at ¶ 27. The

state was only required to prove one of the three elements — that Hughkeith was at fault in creating the situation giving rise to the affray; that he lacked a bona fide belief that he was in imminent danger of death or great bodily harm or that another means of escape from such danger existed negating the need for the use of deadly force; or that he violated a duty to retreat or avoid the danger — beyond a reasonable doubt to establish that self-defense does not apply. *State v. Travis*, 8th Dist. Cuyahoga No. 110514, 2022-Ohio-1233.

{¶ 56} Relevant to the issues presented in this case, the second element of self-defense involves both objective and subjective considerations. *State v. Thomas*, 77 Ohio St.3d 323, 330, 673 N.E.2d 1339 (1997); *Parma v. Treanor*, 2018-Ohio-3166, 117 N.E.3d 970, ¶ 25 (8th Dist.); *State v. Smith*, 1st Dist. Hamilton No. C-190507, 2020-Ohio-4976, ¶ 56, citing *State v. Vanover*, 1st Dist. Hamilton No. C-990104, 2000 Ohio App. LEXIS 4469, *3 (Sept. 29, 2000). A defendant's belief that she was in immediate danger of death or great bodily harm must be objectively reasonable, and the defendant must have an honest belief that she sat in such danger. *Id*. "[I]f the objective standard is met, the jury must determine if, subjectively, this particular defendant had an honest belief that she was in imminent danger." *Thomas* at 326. The state may disprove self-defense by demonstrating that the defendant's belief was not objectively reasonable or that he or she did not have an honest subjective belief that she faced imminent death or great bodily harm. *Smith* at ¶ 56.

**{¶ 57}** Upon balancing the competing testimony, we do not find the jury clearly lost its way in concluding that the state satisfied its burden of persuasion by demonstrating that Hughkeith did not act in self-defense when he shot and killed Powell. In reaching this conclusion, we recognize that Powell's conduct inside the Mr. Hero's restaurant was certainly unsettling and would cause a reasonably objective person to believe that he or she was in imminent danger. However, Hughkeith took the necessary steps to avoid a dangerous confrontation with Powell inside the restaurant by making the conscious decision to leave the premises before the situation escalated. Once outside, Hughkeith retreated to his vehicle and had the opportunity to leave the shopping center altogether. The affray had ended. *See State v. Santana*, 2d Dist. Montgomery No. 29348, 2022-Ohio-4118, ¶ 32-33. Instead, the surveillance-video footage establishes that Hughkeith stood behind his vehicle and waited until Powell was approximately two parking spaces away from his black SUV before Hughkeith unexpectedly fired his gun multiple times. When the first gunshot was fired, Powell was holding a fountain drink in his left hand and his right hand was extended away from his body. After the first shots were fired, Hughkeith came around the back of the black SUV, where Powell was attempting to hide, and fired a succession of additional gun shots. Powell immediately fell to the ground, where he succumbed to his gunshot wounds. Powell never brandished his weapon while approaching his vehicle or during the exchange of gunfire between Hughkeith, White, and Robinson.

{¶ 58} It is well settled that "'a conviction is not against the manifest weight of the evidence simply because the [trier of fact] rejected the defendant's version of the facts and believed the testimony presented by the state.'" *State v. Jallah*, 8th Dist. Cuyahoga No. 101773, 2015-Ohio-1950, ¶ 71, quoting *State v. Hall*, 4th Dist. Ross No. 13CA3391, 2014-Ohio-2959, ¶ 28. In this case, the jury, as the tier of fact, was equipped with the necessary information to adequately assess the strength of the state's evidence, the nature of Powell's conduct at the time of the shooting, and the credibility of Hughkeith's subjective interpretation of the facts. Significantly, the entirety of Hughkeith's interaction with Powell at the Buckeye Plaza shopping center was captured by surveillance cameras. Under these circumstances, the jury was free to accept the state's evidence and conclude that Hughkeith did not have a reasonable and honest belief that he was in imminent danger of death or great bodily harm and that his only means of escape was in the use of deadly force.

{¶ 59} Based on the foregoing, we find the manifest weight of the evidence support's Hughkeith's convictions. The second assignment of error is overruled.

### C. Right to Remain Silent

{¶ 60} In the third assignment of error, Hughkeith argues the trial court erred by "failing to make a record as to [his] waiver of his constitutional right to remain silent."

{¶ 61} The right to testify at one's own criminal trial is rooted in the Due Process Clause of the Fourteenth Amendment, the Compulsory Process Clause of the Sixth Amendment, and the Fifth Amendment's privilege against self-

incrimination. *Rock v. Arkansas*, 483 U.S. 44, 51-53, 107 S. Ct. 2704, 97 L.Ed.2d 37 (1987). "Generally, the defendant's right to testify is regarded both as a fundamental and a personal right that is waivable only by an accused." *State v. Bey*, 85 Ohio St.3d 487, 497, 709 N.E.2d 484 (1999). The ultimate decision of whether to testify rests with the defendant, but because attorneys are presumed to follow the professional rules of conduct and presumed to render adequate assistance in advocating the defendant's cause and in consulting with the defendant on important decisions, the defendant's assent may be presumed when a tactical decision is made to not have the defendant testify. *United States v. Webber*, 208 F.3d 545, 551 (6th Cir.2000). Barring any statements or actions from the defendant indicating either disagreement with counsel or the desire to testify, the trial court is not required to ensure that the defendant has waived the right to testify on the record. *State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, 23 N.E.3d 1023, ¶ 162, citing *Webber* at 551.

{¶ 62} In this case, Hughkeith exercised his fundamental right to testify on his own behalf at trial. In doing so, he waived his right to remain silent. *State v. Belville*, 6th Dist. Lucas No. L-96-195, 1997 Ohio App. LEXIS 1267, 6 (Apr. 4, 1997) (A defendant's "election to testify on his [or her] own behalf waives his [or her] right to remain silent and any exercises of that right."), citing *Jenkins v. Anderson*, 447 U.S. 231, 238, 65 L.Ed.2d 86, 100 S.Ct. 2124 (1980). On appeal, Hughkeith has cited no persuasive authority to suggest that once a defendant exercises his or her right to testify at trial, the trial court has a corresponding duty to ensure that the defendant

has knowingly and intelligently waived the right to remain silent. Accordingly, we find no error. *In re B.P.*, 9th Dist. Lorain No. 14CA010531, 2015-Ohio-48, ¶ 10, citing App.R. 16(A)(7).

{¶ 63} The third assignment of error is overruled.

### D. Judicial Bias

{¶ 64} In the fourth assignment of error, Hughkeith argues the trial court failed to maintain impartiality and was biased against him throughout the criminal proceedings. Hughkeith contends the trial court's bias and prejudice is reflected by (1) the frequency of the court's evidentiary rulings in favor of the state, (2) the court's "repeated admonishments" of Hughkeith during his direct examination, (3) the court's threat to impose "severe penalties" on Hughkeith if he asked family members to make social-media posts on his behalf, and (4) the court's instruction to the state to patrol the defendants' social media accounts.

{¶ 65} Appellate courts generally "lack the authority to find that a judge was biased against a party or void a trial court's judgment on a claim that the trial judge was biased." *State v. Reese*, 8th Dist. Cuyahoga No. 107714, 2019-Ohio-4670, ¶ 25, citing *State v. Ramos*, 88 Ohio App.3d 394, 398, 623 N.E.2d 1336 (9th Dist.1993), citing *Beer v. Griffith*, 54 Ohio St.2d 440, 377 N.E.2d 775 (1978). Rather, "[t]he Chief Justice of the Supreme Court of Ohio, or his [or her] designee, has exclusive jurisdiction to determine a claim that a common pleas judge is biased or prejudiced." *Jones v. Billingham*, 105 Ohio App.3d 8, 11, 663 N.E.2d 657 (2d Dist.1995), citing Article IV, Section 5(C), Ohio Constitution.

{¶ 66} Nevertheless, "it is axiomatic that the Due Process Clause requires a fair trial in a fair tribunal before an impartial judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 905, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997); *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 34.  Thus, the Ohio Supreme Court has recognized that proceedings before a biased judge are fundamentally unfair and denies a defendant due process of law.  *State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, 937 N.E.2d 97, ¶ 48.  Accordingly, a trial court's judgment may be reversed due to bias if the bias or prejudice violated the defendant's right to due process and deprived the defendant of a fair proceeding.  *Id*.

> Judicial bias has been described by the Supreme Court of Ohio as a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts.

*State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463, 132 N.E.2d 191 (1956), paragraph four of the syllabus.  "If the trial judge forms an opinion based on facts introduced or events occurring during the course of the current or prior proceedings, this does not rise to the level of judicial bias, "'unless [the opinions] display a deep-seated favoritism or antagonism that would make fair judgment impossible.'""  *State v. Hough*, 2013-Ohio-1543, 990 N.E.2d 653, ¶ 11 (8th Dist.), quoting *Dean* at ¶ 49, quoting *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

{¶ 67} "In determining whether purported judicial bias resulted in a due process violation, we presume that a judge is unbiased and unprejudiced in the matters over which he or she presides, and '"the appearance of bias or prejudice must be compelling in order to overcome the presumption."'" *Cleveland v. Goodman*, 8th Dist. Cuyahoga Nos. 108120 and 108678, 2020-Ohio-2713, ¶ 18, *State v. Eaddie*, 8th Dist. Cuyahoga No. 106019, 2018-Ohio-961, ¶ 18, quoting *State v. Filous*, 8th Dist. Cuyahoga No. 104287, 2016-Ohio-8312, ¶ 14.

{¶ 68} After careful review of the record, we find Hughkeith has failed to overcome the presumption that the trial court was unbiased and unprejudiced against him. In this case, Hughkeith has cited various portions of the trial transcript, arguing that the record demonstrates that the trial court overwhelmingly ruled in favor of the state while consistently overruling defense counsel's evidentiary objections. Hughkeith suggests the trial court's pattern of judgment "exhibited judicial bias against the defense, and communicate[d] that bias to the jury." We disagree. Significantly, Hughkeith's position does not consider the propriety of the cited objections or whether the trial court's evidentiary rulings were arbitrary or in violation of the Ohio Rules of Evidence. Absent additional indicia of bias, we are unable to conclude that the trial court's evidentiary rulings amounted to "deep-seated antagonism" merely because the rulings were unfavorable to Hughkeith.

{¶ 69} We further find no merit to Hughkeith's contention that the trial court demonstrated bias against him by "admonishing" him in front of the jury. In this case, the alleged admonishments included the court (1) instructing Hughkeith to

only answer the questions posed to him during his cross-examination, (2) clarifying the state's posed question on cross-examination, and (3) asking Hughkeith to repeat his answer because he was "mumbling a little bit." (Tr. 1188, 1236-1247, 1239, 12773, 1275, 1284, 1288-1289, 1292.) Viewing the challenged portions of the testimony in context, we find the trial court's instructions to Hughkeith during his direct examination were consistent with the court's role as the gatekeeper and its obligation to ensure that the jury could hear Hughkeith's testimony without obstruction. *See Goodman*, 8th Dist. Cuyahoga Nos. 108120 and 108678, 2020-Ohio-2713, at ¶ 20 ("[T]he trial court's instruction to [the defendant] to answer the questions posed during his cross-examination was consistent with the court's role as the gatekeeper."). The court's conduct was proper.

{¶ 70} Finally, the trial court did not exhibit prejudicial bias by ensuring that all parties, including Hughkeith and his codefendant, abided by the court's order to refrain from taking photographs inside the courtroom or posting on social media. In this case, the trial court made the following statement on the record:

> THE COURT: We're back on the record. Your jail calls get listened to every day. Girlfriend's prohibited from being in this courtroom again. I've made it very clear there's to be no photographs. Don't ask anybody else to take a photograph. I'm asking the prosecutors to search social media every day, and if I find out that somebody in this room is taking a photograph and if I find out you're involved in it, you're going to face separate penalties. This isn't a joke, Mr. Caldwell.

(Tr. 628.)

{¶ 71} The challenged advisement was made after the court learned from a recorded jail-cell phone call that Caldwell asked "somebody" to post a photograph

of him in court on social media. Significantly, the advisement was made to codefendant Caldwell, not Hughkeith, outside the presence of the jury. The court certainly did not demonstrate bias against Hughkeith merely because it warned his codefendant to abide by the court's restriction against photographs and social media posts relating to the pending trial.

{¶ 72} Based on the foregoing, we find no merit to Hughkeith's claim of judicial bias. The fourth assignment of error is overruled.

### E. Duty to Retreat

{¶ 73} In the fifth assignment of error, Hughkeith argues the trial court erred by instructing the jury on the duty to retreat. Hughkeith contends that, at the time of his trial, there was no duty to retreat in the state of Ohio. Thus, Hughkeith asserts that the trial court's erroneous instruction on the duty to retreat misled the jury or otherwise prejudiced his right to a fair trial.

{¶ 74} Jury instructions are "critically important to assist juries in determining the interplay between the facts of the case before it and the applicable law." *State v. Griffin*, 141 Ohio St.3d 392, 2014-Ohio-4767, 24 N.E.3d 1147, ¶ 5. Although a trial court has "broad discretion to decide how to fashion jury instructions," the trial court must "'fully and completely give all jury instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.'" *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 46, quoting *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus. Requested jury instructions should

"ordinarily be given if they are correct statements of law, if they are applicable to the facts of the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 240.

{¶ 75} As a general matter, we review a trial court's decision on jury instructions for an abuse of discretion. *State v. Daniel*, 2016-Ohio-5231, 57 N.E.3d 1203, ¶ 30 (8th Dist.), citing *State v. Leonard*, 8th Dist. Cuyahoga No. 98626, 2013-Ohio-1446, ¶ 33. However, what law applies and whether a jury instruction correctly states the applicable law are legal issues an appellate court reviews de novo. *See, e.g., State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 135. An incorrect or inadequate instruction that misleads the jury or otherwise prejudices the defendant constitutes reversible error. *See Simbo Props. v. M8 Realty, L.L.C.*, 2019-Ohio-4361, 149 N.E.3d 941, ¶ 18 (8th Dist.).

{¶ 76} In this case, the alleged offenses occurred on or about August 8, 2020. Hughkeith was indicted on August 24, 2020, and his jury trial commenced in May 2022. On April 6, 2021, while his case was pending, R.C. 2901.09(B) was amended pursuant to S.B. 175. Prior to the 2021 amendments, R.C. 2901.09(B) stated:

> For purposes of any section of the Revised Code that sets forth a criminal offense, a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence, and a person who lawfully is an occupant of that person's vehicle or who lawfully is an occupant in a vehicle owned by an immediate family member of the person has no duty to retreat before using force in self-defense or defense of another.

{¶ 77} R.C. 2901.09(B) now states:

For purposes of any section of the Revised Code that sets forth a criminal offense, a person has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence if that person is in a place in which the person lawfully has a right to be.

**{¶ 78}** The 2021 amendments also added R.C. 2901.09(C), which states: "A trier of fact shall not consider the possibility of retreat as a factor in determining whether or not a person who used force in self-defense, defense of another, or defense of that person's residence reasonably believed that the force was necessary to prevent injury, loss, or risk to life or safety." The amendments are generally referred to as the "stand-your-ground law." *State v. Dixon*, 2d Dist. Greene No. 2021-CA-29, 2022-Ohio-3157, ¶ 9.

**{¶ 79}** Since the modification of R.C. 2901.09, Ohio courts have debated whether the current version of the statute applies to offenders who committed the offense prior to the amendment but who are tried after the amendment became effective. This court has previously held that the 2021 amendments to R.C. 2901.09 do not apply to offenses that were committed prior to the April 6, 2021 effective date. *See State v. Duncan,* 8th Dist. Cuyahoga No. 110784, 2022-Ohio-3665, ¶ 26*; State v. Claytor*, 8th Dist. Cuyahoga No. 110837, 2022-Ohio-1938, ¶ 77-79; *State v. Hurt*, 8th Dist. Cuyahoga No. 110732, 2022-Ohio-2039, ¶ 56-66 ("There is no language in amended R.C. 2901.09 indicating that the General Assembly intended the statute to be applied retroactively."). *See also State v. Huish*, 10th Dist. Franklin No. 21AP-255, 2023-Ohio-365, ¶ 63, fn. 8; *State v. Parker*, 1st Dist. Hamilton No. C-210440, 2022-Ohio-3831, ¶ 14; *State v. Jones*, 2d Dist. Montgomery No. 29214, 2022-Ohio-

3162, ¶ 39; *State v. Degahson*, 2d Dist. Clark No. 2021-CA-35, 2022-Ohio-2972, ¶ 19 ("[W]e find no language in the amended R.C. 2901.09 that would indicate the legislature obviously intended the statute to be applied retroactively."). *But see State v. Wagner*, 11th Dist. Lake No. 2021-L-101, 2022-Ohio-4051, ¶ 28; *State v. Robinette*, 5th Dist. Stark No. 2021 CA 00124, 2023-Ohio-5, ¶ 52. Thus, it is well settled in this district that "the amendments to R.C. 2901.09(C) do not apply retroactively and are not required if the April 6, 2021, amendments were not in effect at the time of the offense." *Duncan* at ¶ 26.

{¶ 80} In this case, the trial court originally provided a self-defense instruction that did not contemplate the amendments of R.C. 2901.09. (Tr. 1495.) After the jurors were excused for deliberations, defense counsel asserted that the trial court's self-defense instruction was incomplete because the court failed to instruct the jury that "the defendant had no duty to retreat before using force in self-defense if the defendant was in a place in which he lawfully had a right to be." (Tr. 1535.) Following an extensive discussion on the record, the trial court agreed to reinstruct the jury on self-defense. On this occasion, the trial court expanded upon its prior self-defense instruction, stating, in pertinent part:

> In determining whether the defendant, in using force in self-defense, reasonably believed that the force was necessary to prevent injury, loss, or risk to life or safety, you may not consider the possibility of retreat by the defendant.
>
> The defendant had no duty to retreat before using force in self-defense if the defendant was in a place in which he lawfully had a right to be.
>
> Lawfully had a right to be means that the defendant was not trespassing when he used force in self-defense.

(Tr. 1544-1545.)

{¶ 81} Although the precedent of this court demonstrates that Hughkeith was not entitled to the retroactive application of amended R.C. 2901.09(B), the record reflects that he was afforded the benefit of the amended statute as the trial court unambiguously instructed the jury that Hughkeith had no duty to retreat from any place he was lawfully entitled to be. Contrary to Hughkeith's assertion on appeal, the trial court's supplemental instruction was not confusing or otherwise misleading. To the contrary, the court's decision to apply the amended statute was substantially beneficial to Hughkeith's defense and prohibited the jury from considering the possibility of retreat in determining whether he reasonably believed force was necessary.

{¶ 82} The fifth assignment of error is overruled.

### F. Failure to Object to Self-Defense Jury Instruction

{¶ 83} In the sixth assignment of error, Hughkeith argues defense counsel rendered ineffective assistance of counsel by failing to object to the trial court's jury instruction on self-defense.

{¶ 84} Our review of counsel's performance is highly deferential. *State v. Korecky*, 8th Dist. Cuyahoga No. 108328, 2020-Ohio-797, ¶ 20, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because we presume licensed attorneys are competent, the party claiming ineffective assistance of counsel bears the burden of proving that counsel was ineffective. *Id.*, citing *State v. Smith*, 17 Ohio St.3d 98, 477 N.E.2d 1128 (1985).

{¶ 85} "To gain reversal on a claim of ineffective assistance of counsel, a defendant must show that (1) his 'counsel's performance was deficient,' and (2) 'the deficient performance prejudiced the defense.'" *State v. Fisher*, 8th Dist. Cuyahoga No. 108494, 2020-Ohio-670, ¶ 18, quoting *Strickland* at 687. "The first prong of *Strickland*'s test requires the defendant to show 'that counsel's representation fell below an objective standard of reasonableness.'" *Id.*, quoting *Strickland* at 688. "*Strickland*'s second prong requires the defendant to show 'a reasonable probability that but for counsel's errors, the proceeding's result would have been different.'" *Id.*, quoting *State v. Winters*, 8th Dist. Cuyahoga No. 102871, 2016-Ohio-928, ¶ 25. That is, the second prong requires a determination as to whether the defense was prejudiced by counsel's ineffectiveness. *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 140, citing *Strickland* at 687.

{¶ 86} Consistent with his previous arguments, Hughkeith argues trial counsel rendered ineffective assistance of counsel by failing to raise a timely objection to the court's instruction on self-defense. Specifically, Hughkeith challenges the trial court's instruction regarding the first element of a self-defense claim. The challenged instruction, which was made at the time the court reinstructed the jury on self-defense, provided, in relevant part:

> The defendant did not act in self-defense if the state proved beyond a reasonable doubt the defendant was at fault in creating the situation that resulted in the death and/or injury. The defendant was at fault if the defendant was the initial aggressor; and A, Michael Powell and/or James White did not escalate the situation by being the first to use or attempt to use deadly force; or B, the defendant provoked Michael Powell and/or James White into using force; or C, the defendant did

not withdraw from the situation; or D, the defendant withdrew from the situation but did not inform Michael Powell and/or James White of his withdrawal.

(Tr. 1543.)

{¶ 87} Relying on the implications of the newly enacted stand-your-ground law, Hughkeith contends that it was misleading for the trial court to instruct the jury that he was at fault in creating the situation that resulted in death or injury if (1) he was the initial aggressor and (2) "did not withdraw from the situation." (Tr. 1543.) Hughkeith asserts that "there is no tactical basis for failing to object to a jury instruction which is not supported by the facts, is not an accurate statement of current law, and prejudicially effects the outcome of the case."

{¶ 88} After careful consideration, we cannot say defense counsel rendered ineffective assistance of counsel by failing to object to the cited portion of the trial court's self-defense instruction. Initially, we find no merit to Hughkeith's assertion that the trial court's instruction on the element of fault was "not applicable to the facts." Hughkeith sought the self-defense instruction, and the trial court was free to instruct the jury on each of the applicable elements of the affirmative defense. Moreover, assuming, for the sake of argument, that the trial court properly instructed the jury on the duty to retreat pursuant to the current version of R.C. 2901.09(B), Hughkeith has cited no case law to suggest the trial court's "at fault" instruction was inconsistent with the current law. While a person no longer has a duty to retreat from a place he or she is lawfully permitted to be, there is no language in the amended statute to suggest a trier of fact is precluded from considering

whether the defendant was the initial aggressor or whether the defendant attempted to withdraw from the situation when determining whether the defendant was at fault in creating the situation giving rise to the affray. The narrow language of the amended statute does not place on triers of fact express restrictions on consideration of fault. We further note that although Ohio Jury Instructions are not binding, the trial court's "at fault" instruction in this case tracks the language of Ohio Jury Instructions 421.21, which has been amended since April 2021, and contemplates the "abolishment of the duty to retreat." Under these circumstances, Hughkeith has failed to establish counsel's deficient performance or resulting prejudice.

{¶ 89} The sixth assignment of error is overruled.

### G. Failure to Request Jury Instructions on Lesser-Included of Inferior-Degree Offenses

{¶ 90} In the seventh assignment of error, Hughkeith argues trial counsel rendered ineffective assistance of counsel by failing to request an instruction on the lesser-included offenses of voluntary manslaughter and aggravated assault. Hughkeith contends that "trial counsel's failure to request a lesser-included [offense instruction] was not the result of any reasonable trial strategy and fatally prejudiced [him]."

{¶ 91} The Ohio Supreme Court has explained that under Crim.R. 31(C) and R.C. 2945.74, a jury may consider lesser unindicted offenses only if the evidence supports the lesser charge and the lesser charge is either (1) a lesser-included offense of the crime charged; (2) an inferior degree offense of the crime charged; or (3) an

attempt to commit the crime charged, if such an attempt is an offense at law. *State v. Deem*, 40 Ohio St.3d 205, 208, 533 N.E.2d 294 (1988); *State v. Davis*, 9th Dist. Summit No. 25826, 2012-Ohio-1440, ¶ 20.

{¶ 92} A lesser-included offense is one in which

> (i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense.

*Deem* at paragraph three of the syllabus. By contrast, "an offense is an 'inferior degree' of the indicted offense where its elements are identical to or contained within the indicted offense, except for one or more additional mitigating elements." *Id*. at paragraph two of the syllabus.

{¶ 93} Generally, "a charge on a lesser-included or inferior offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser-included or inferior offense." *State v. Carter*, 2018-Ohio-3671, 119 N.E.3d 896, ¶ 59 (8th Dist.), citing *State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286 (1988), paragraph two of the syllabus. In determining whether a lesser-included or inferior-offense instruction is appropriate, the trial court must view the evidence in the light most favorable to the defendant. *Id*. at ¶ 59, citing *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 37.

{¶ 94} An instruction is not warranted, however, every time "some evidence" is presented on a lesser-included or inferior offense. *State v. Smith*, 8th Dist.

Cuyahoga No. 90478, 2009-Ohio-2244, ¶ 12, citing *State v. Shane*, 63 Ohio St.3d 630, 590 N.E.2d 272 (1992).

> To require an instruction * * * every time some evidence, however minute, is presented going to a lesser-included (or inferior-degree) offense would mean that no trial judge could ever refuse to give an instruction on a lesser-included (or inferior-degree) offense.

*Id.*, quoting *Shane* at 633. Thus, a court must find there is sufficient evidence to allow a jury to reasonably reject the greater offense and find the defendant guilty on the lesser-included or inferior offense. *Shane* at 632-633.

{¶ 95} Voluntary manslaughter is defined in R.C. 2903.03(A). The statute provides as follows:

> No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another.

{¶ 96} In turn, aggravated assault is codified in R.C 2903.12(A)(1), which provides, in part, that

> [n]o person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly * * * cause serious physical harm to another.

{¶ 97} Ohio courts have recognized that "aggravated assault is an inferior-degree offense to felonious assault and that voluntary manslaughter is an inferior-degree offense to murder." *State v. Dixon*, 2d Dist. Greene No. 2021-CA-29, 2022-Ohio-3157, ¶ 21; *see also State v. Wiley*, 8th Dist. Cuyahoga No. 110753, 2022-Ohio-2131, ¶ 18 ("Voluntary manslaughter is an inferior degree offense of murder."); *State*

*v. Martin*, 2018-Ohio-1098, 109 N.E.3d 652, ¶ 8 (8th Dist.) ("[A]ggravated assault is an inferior degree of felonious assault[.]"). This is because aggravated assault and voluntary manslaughter both contain an additional mitigating element of "serious provocation." *State v. Rider*, 2d Dist. Champaign No. 2021-CA-12, 2022-Ohio-1964, ¶ 39-40. In other words, the greater- degree and inferior-degree offenses are similar except aggravated assault and voluntary manslaughter require proof that a defendant acted under the influence of sudden passion or in a fit of rage brought about by serious provocation. *State v. Miller*, 2d Dist. Montgomery No. 29099, 2022-Ohio-213, ¶ 16; *State v. Robinson*, 2d Dist. Clark No. 2021-CA-3, 2021-Ohio-3255, ¶ 11.

> Provocation, to be serious, must be reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force. In determining whether the provocation was reasonably sufficient to incite the defendant into using deadly force, the court must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time.

*State v. Mabry*, 5 Ohio App.3d 13, 449 N.E.2d 16 (8th Dist.1982), paragraph five of the syllabus.

{¶ 98} In *Shane*, 63 Ohio St.3d 630, 590 N.E.2d 272, the Supreme Court elaborated on what constitutes "reasonably sufficient" provocation. First, an objective standard must be applied to determine whether the alleged provocation is reasonably sufficient to bring on a sudden passion or fit of rage. That is, the provocation must be "sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *Id*. at 635. If this objective standard is met, the

inquiry shifts to a subjective standard, to determine whether the defendant in the particular case "actually was under the influence of sudden passion or in a sudden fit of rage." *Id.* at 634-635.

{¶ 99} On appeal, Hughkeith has cited no evidence in the record to support his contention that the trial court was obligated to instruct the jury on the inferior offenses of voluntary manslaughter and aggravated assault. Despite Hughkeith's repeated failure to comply with App.R. 16, we nevertheless find no merit to the substance of his assertion.

{¶ 100} In Ohio, a licensed attorney is presumed to be competent. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999). In evaluating trial counsel's performance, appellate review is highly deferential as there is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland* at 689. Appellate courts are not permitted to second-guess the strategic decisions of trial counsel. *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995). Even instances of debatable strategy very rarely constitute ineffective assistance of counsel. *See State v. Thompson*, 33 Ohio St.3d 1, 10, 514 N.E.2d 407 (1987).

{¶ 101} Generally, "the decision about which defense or theory to pursue at trial is a matter of trial strategy '"within the exclusive province of defense counsel to make after consultation with his [or her] client.'"" *State v. Lloyd*, 8th Dist. Cuyahoga No. 109128, 2021-Ohio-1808, ¶ 32, quoting *State v. Murphy*, 91 Ohio St.3d 516, 524,

747 N.E.2d 765 (2001), quoting *Lewis v. Alexander*, 11 F.3d 1349, 1354 (6th Cir.1993).

{¶ 102} This court has recognized that aggravated assault and voluntary manslaughter are incompatible with a theory of self-defense because self-defense requires proof of fear while aggravated assault and voluntary manslaughter require a showing of a sudden passion or rage. *See State v. Bouie*, 8th Dist. Cuyahoga No. 108095, 2019-Ohio-4579, ¶ 47 ("it has been held that in most cases, jury instructions on both self-defense and serious provocation are inconsistent" because "the mental states of fear as required for self-defense and rage as required for aggravated assault are incompatible"); *State v. Betliskey*, 8th Dist. Cuyahoga No. 101330, 2015-Ohio-1821, ¶ 24 (jury instruction on aggravated assault not required where defense theory was self-defense); *State v. Loyed*, 8th Dist. Cuyahoga No. 83075, 2004-Ohio-3961, ¶ 14 (instruction on voluntary manslaughter not required where defense asserted self-defense because the theories were incompatible and "it must be one or the other").

{¶ 103} Contrary to, and inconsistent with, defense counsel's theory and interpretation of the evidence, Hughkeith now argues that a jury instruction on the inferior-degree offenses of voluntary manslaughter and aggravated assault was warranted in this case. As stated, however, defense counsel maintained throughout the entirety of the trial that Hughkeith acted in self-defense and only fired the fatal gunshots because he feared imminent death or great bodily harm. At no point did the defense argue or introduce evidence to insinuate that Hughkeith acted under the

influence of sudden passion or in a fit of rage.[1]  This was because defense counsel sought an acquittal in this case based upon counsel's perception of the state's evidence; not a conviction on an inferior offense.  *See State v. Scarton*, 8th Dist. Cuyahoga No. 108474, 2020-Ohio-2952, ¶ 99; *State v. Lenard*, 8th Dist. Cuyahoga Nos. 105342 and 105343, 2018-Ohio-4847, ¶ 18; *State v. Carter*, 8th Dist. Cuyahoga No. 104653, 2017-Ohio-5573, ¶ 53-54 (Failing to request an instruction on an inferior offense does not rise to the level of ineffective assistance of counsel where trial counsel's strategy was to obtain an acquittal rather than a conviction of an inferior offense.).  Trial counsel's strategy at trial, even if "questionable" or "if, in hindsight, it looks as if a better strategy had been available," does not support a claim of ineffective assistance of counsel.  *See, e.g., State v. Cottrell*, 4th Dist. Ross Nos. 11CA3241 and 11CA3242, 2012-Ohio-4583, ¶ 21; *State v. Henderson*, 7th Dist. Mahoning No. 15 MA 0137, 2018-Ohio-2816, ¶ 71-73.

{¶ 104} Accordingly, we find Hughkeith has failed to overcome the presumption that trial counsel's decision to forego an inferior-degree-offense

---

[1] The record further demonstrates that an instruction on inferior offenses was not supported by the evidence.  In this case, Hughkeith consistently testified that he acted out of fear.  (Tr. 1210, 1212, 1218, 1219, 1229, 1346.)  However, "[f]ear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage."  *State v. Mack*, 82 Ohio St.3d 198, 201, 694 N.E.2d 1328 (1998).  Indeed, a defendant's fear for his own safety or for the safety of others "does not constitute sudden passion or a fit of rage as contemplated by the voluntary manslaughter statute."  *State v. Harris*, 129 Ohio App.3d 527, 535, 718 N.E.2d 488 (10th Dist.1998).  Thus, "[s]hooting someone 'out of fear rather than rage or passion [does] not support a jury instruction for voluntary manslaughter.'"  *State v. Hodge*, 10th Dist. Franklin No. 18AP-95, 2019-Ohio-4012, ¶ 39, quoting *State v. Stevenson*, 10th Dist. Franklin No. 17AP-512, 2018-Ohio-5140, ¶ 29.

instruction was a strategic maneuver designed to obtain an acquittal, instead of a conviction on an inferior-degree offense. *See State v. Smith*, 8th Dist. Cuyahoga No. 90478, 2009-Ohio-2244, ¶ 13 (trial counsel, who chose to pursue theory of self-defense, was not ineffective in failing to seek instruction on lesser-included offense of voluntary manslaughter; decision "was a reasonable trial strategy calculated to obtain a complete acquittal").

{¶ 105} The seventh assignment of error is overruled.

## H. Limitations on Hughkeith's Testimony

{¶ 106} In the eighth assignment of error, Hughkeith argues the trial court violated his constitutional rights to due process and a fair trial by repeatedly interrupting and "excessively inhibiting" his testimony. Hughkeith contends that "because of the continued and excessive interruptions by the trial court, [he] was not afforded the opportunity to tell his story in his own words."

{¶ 107} As previously stated, a defendant in a criminal case has the due-process right to take the witness stand and to testify in his or her own defense. *Rock*, 483 U.S. at 51, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); *Harris v. New York*, 401 U.S. 222, 225, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). "Whether the defendant is to testify is an important tactical decision as well as a matter of constitutional right." *Brooks v. Tennessee,* 406 U.S. 605, 612, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972). A defendant's right to testify is not without limitation, however, and "'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.' * * * But restrictions of a defendant's right to testify may not be arbitrary or

disproportionate to the purposes they are designed to serve." *Rock* at 55-56, quoting *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

{¶ 108} In this case, there is no dispute that Hughkeith exercised his right to testify on his own behalf and was provided ample opportunity on direct examination to articulate his version of events to the trier of fact. Nevertheless, Hughkeith contends that the court unduly interfered with his defense by interrupting his testimony "more than ten times during cross-examination." (Tr. 1236-1237, 1239, 1273, 1275, 1284, 1288-1289, 1292.) Hughkeith's citation to these alleged "interruptions" were previously addressed in Hughkeith's claim of judicial bias. In most part, the trial court's comments involved instances where Hughkeith was advised to only answer the questions posed on cross-examination and to refrain from testifying in the narrative.

{¶ 109} Consistent with our prior discussion, we cannot say the court prejudicially impaired Hughkeith's defense by requiring him to limit his answers to those questions posed by the state on cross-examination. Here, the trial court did not offer any commentary reflecting the court's personal views or the court's perception of the state's case against Hughkeith. Rather, the court's interruptions were isolated and made in accordance with the court's role as the gatekeeper of evidence.

{¶ 110} The eighth assignment of error is overruled.

## I. Prosecutorial Misconduct

{¶ 111} In the ninth assignment of error, Hughkeith argues the state committed prosecutorial misconduct by referring to Powell as "defenseless" and by inferring that Hughkeith could have "diffused the whole situation" by showing Powell that he had a gun inside the restaurant. Hughkeith asserts that the prosecutor's insinuations "were not made in good faith but are intended to confuse the jury by creating an inference that (1) [Hughkeith] had a duty to threaten Powell prior to his efforts to leave the situation, and (2) that [Hughkeith] was required to warn Powell prior to defending himself."

{¶ 112} The test for prosecutorial misconduct is whether the prosecutor's "'remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.'" *State v. Hessler*, 90 Ohio St.3d 108, 125, 734 N.E.2d 1237 (2000), quoting *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). An appellate court should only reverse a conviction if the effect of the misconduct "'permeates the entire atmosphere of the trial.'" *State v. Gibson*, 8th Dist. Cuyahoga No. 98725, 2013-Ohio-4372, ¶ 99, quoting *State v. Tumbleson*, 105 Ohio App.3d 693, 699, 664 N.E.2d 1318 (12th Dist.1995). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 92, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶ 113} In this case, Hughkeith asserts that the following questions during his cross-examination amounted to prosecutorial misconduct:

PROSECUTION: Well, I'm not asking if you're causing harm with the gun; I asked you why you carried that gun and you said because you live in a dangerous neighborhood. People get shot all the time. So if you carry it around without the intent of using it, what's the point?

HUGHKEITH: There's no point.

PROSECUTION: No point. Well, in this situation couldn't you have shown Mr. Powell you also had a gun and said, hey, let's not — let's not shoot each other today. We both have guns. Let's all just walk away.

HUGHKEITH: No.

* * *

PROSECUTION: Again, if the intent is to not use it, why don't you show him your gun right now before a shot is ever fired?

HUGHKEITH: I didn't. I did not.

PROSECUTION: I know. Why not?

HUGHKEITH: I don't know.

PROSECUTION: You could have diffused this whole situation.

* * *

HUGHKEITH: How can I try to diffuse a situation? The man got a gun, about to aim it at me.

(Tr. 1242-1244.) Hughkeith did not object to this line of questioning and, therefore, has waived all but plain error.

{¶ 114} Cross-examination is entitled to wide latitude, and its scope is within the trial court's discretion. *State v. Garfield*, 34 Ohio App.3d 300, 303, 518 N.E.2d 568 (11th Dist.1986), citing *State v. Huffman*, 86 Ohio St. 229, 99 N.E. 295 (1912). In this case, Hughkeith provided extensive testimony on direct examination

concerning his initial interaction with Powell and his belief that Powell intended to cause him bodily harm once they were both in the parking lot. Hughkeith's subjective interpretation of Powell's movements and whether Hughkeith possessed a firearm during their initial confrontation inside the restaurant was certainly relevant, and the state was entitled to explore this issue on cross-examination. Although it is implausible to suggest that Hughkeith could have diffused the situation by brandishing his firearm the moment Powell first displayed his weapon, we cannot say the prosecution's questions were improper or beyond the scope of cross-examination. Nor can it be said that the outcome of the trial clearly would have been different but for the state's line of questioning on cross-examination.

{¶ 115} Hughkeith further argues the state engaged in prosecutorial misconduct by referring to Powell as being "defenseless" during its closing remarks. (Tr. 1399.) Hughkeith contends that the state's characterization of Powell was misleading and inconsistent with the evidence presented at trial. Again, Hughkeith did not object to the challenged remark.

{¶ 116} Generally, a prosecutor is entitled to wide latitude during closing argument. *State v. Harris*, 2017-Ohio-2751, 90 N.E.3d 342, ¶ 84 (8th Dist.), citing *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768 (1984). And the closing argument must be viewed in its entirety to determine whether the disputed remarks were prejudicial. "[I]solated comments by a prosecutor are not to be taken out of context and given their most damaging meaning." *Gapen* at ¶ 106, citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). In

determining whether a prosecutor's comment was prejudicial, we consider several factors (1) the nature of the remark(s), (2) whether an objection was made by counsel, (3) whether the court gave curative instructions, and (4) the general strength of the evidence against the defendant. *Harris*, citing *State v. Braxton*, 102 Ohio App.3d 28, 41, 656 N.E.2d 970 (8th Dist.1995).

{¶ 117} "The United States Supreme Court has expressly recognized that prosecutors serve a special role in our justice system requiring them to adhere to the highest standards and to avoid improper arguments, insinuations, and assertions calculated to mislead the jury." *State v. Fears*, 86 Ohio St.3d 329, 351, 715 N.E.2d 136 (1999) (Moyer, C.J., concurring in part and dissenting in part). Thus, while a prosecutor may strike hard blows, he or she may not strike foul ones. *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). As recognized by this court, such "foul blows" include the following:

> [P]ersonally vouching for the credibility of a witness, launching ad hominem attacks against the defendant or [defendant's] lawyer, relying on improper evidence, relying on evidence not in the record, critically commenting on the defendant's exercise of his [or her] rights such as the right to remain silent or the right to a jury trial, and deliberately misleading the jury.

*State v. Hough*, 8th Dist. Cuyahoga No. 91691, 2011-Ohio-2656, ¶ 7.

{¶ 118} After careful consideration, we find no merit to Hughkeith's contention that the state's comment "was tantamount to misconduct." It is well settled that the state is permitted to freely comment on ""what the evidence has shown and what reasonable inferences may be drawn therefrom."" *State v. Fudge*,

2018-Ohio-601, 105 N.E.3d 766, ¶ 48 (10th Dist.), quoting *State v. Muhleka*, 2d Dist. Montgomery No. 19827, 2004-Ohio-1822, ¶ 85; *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). In this case, the location of Powell's firearm at the time he was repeatedly shot was an issue of fact that was highly contested at trial. Although the evidence established that Powell had a gun in his possession at the time of the incident, the state was free to comment on the reasonable inferences that could be drawn by the fact that Powell's firearm was never removed from his waistband during the exchange of fire. Under these circumstances, we find the prosecutor's characterization of Powell's ability to protect himself at the time of the shooting did not constitute error, plain or otherwise.

{¶ 119} The ninth assignment of error is overruled.

{¶ 120} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

LISA B. FORBES, P.J., and
MARY J. BOYLE, J., CONCUR