[Cite as *State v. Carter*, 2024-Ohio-1908.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29919 |
| | : | |
| v. | : | Trial Court Case No. 2021 CR 02340 |
| | : | |
| ALEXIS CARTER | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

· · · · · · · · · · ·

O P I N I O N

Rendered on May 17, 2024

· · · · · · · · · · ·

JOHNNA M. SHIA, Attorney for Appellant

MATHIAS H. HECK, JR., by SARAH H. CHANEY, Attorney for Appellee

· · · · · · · · · · · ·

TUCKER, J.

{¶ 1} Alexis Carter appeals from her conviction on two counts of felonious assault and accompanying firearm specifications.

{¶ 2} Carter contends the trial court erred in its jury instructions on self-defense and defense of another. She also claims the jury's rejection of self-defense and defense of another was against the weight of the evidence.

{¶ 3} We conclude that the trial court accurately instructed the jury and that the evidence supported a finding that Carter did not act in self-defense or defense of another when she shot two victims. Accordingly, the trial court's judgment will be affirmed.

## I. Background

{¶ 4} A grand jury indicted Carter on two counts of felonious assault ("serious physical harm" and "deadly weapon") for each of two victims. All counts included firearm specifications. The charges stemmed from a shooting in the parking lot of Sporty's Tap Room and Grill in Harrison Township shortly after midnight on July 10, 2021.

{¶ 5} The case proceeded to a jury trial in July 2023. The only real issue was whether Carter had shot the two victims, Jasmine Patterson and Jasmine Woodard, in self-defense. Prior to the shooting, the victims had been eating, drinking, and dancing at Sporty's with Lesonya Williams and Lea Tyler. Shortly before midnight, Carter arrived at the bar with her friend Tenisha Maston. Carter and Patterson previously had been involved in a relationship, but they no longer were.

{¶ 6} Around midnight, the two victims and their friends decided to leave the bar about the same time that Carter and Maston decided to leave. While exiting the bar, Carter allegedly pushed Tyler into a door. Carter and Maston proceeded to their vehicle which was parked next to Patterson's car. The victims' group followed Carter and Maston outside. The events that followed, which led up to and included the shooting, were disputed at trial.

{¶ 7} The State presented evidence that Carter began cursing, ran up to Williams, and started "swinging." For her part, Carter testified that Williams approached her and

spit on her before "mutual combat" ensued. The fight evolved into a melee involving everyone but Tyler, who did not participate. There was testimony that the fight subsided before reigniting. In any event, security personnel ultimately used mace to break up the altercation. Carter testified that she lost her glasses during the fight and could not see anything after being sprayed with mace. At that point, the fight appeared to have stopped, at least temporarily, and security left.

{¶ 8} Carter then entered the passenger's side of Maston's vehicle. The parties presented divergent testimony about whether Carter stopped fighting and entered the car of her own accord or whether Maston effectively forced her into the car. Woodard continued "yelling and screaming" and approached Maston's vehicle. Woodard admitted yelling, "I want to see blood." She also opened the driver's side door of Maston's vehicle and threw "gravel" or "rocks" inside. Woodard described the "gravel" as "little bitty broken up pellets." Eyewitness Mary Hall, who was called by the defense and who contacted defense counsel shortly before trial, testified that she saw "gravel," which she described as "rocks," being thrown. On redirect examination by defense counsel, she characterized the rocks as being about the size of a hand. A detective testified that he later observed "some rocks in there, some gravel." For her part, Carter testified that she felt a rock hit her head. Although no car windows were broken, she also stated that she felt shattering glass hit her head.

{¶ 9} While testifying in her own defense, Carter stated that under the foregoing circumstances she feared for her life and did not know whether she would make it home that night. Carter testified that she and Maston were prevented from leaving. Carter stated

that she was being hit with rocks and Maston was being "attacked." After being hit in the head with a rock, she became "fed up." Although still unable to see due to the mace and the loss of her glasses, she felt around inside Maston's car and retrieved a loaded handgun. She stepped out of the car and fired three shots. Carter claimed that she intended to shoot in the air, but one bullet struck Patterson in the buttocks and one struck Woodard in the chest. At the time of the shooting, both victims were on the other side of the car from Carter. Despite the fact that two of her three shots struck Patterson and Woodard, Carter insisted on cross-examination that she could not see and that her intent was not to hit anyone.

{¶ 10} In contrast to Carter's version of events, Williams testified that all fighting had ceased when Carter fired the handgun. According to Williams, Patterson was bent over picking up glasses in the parking lot when Carter shot her in the buttocks. Williams stated that no one was around Carter, who was "by herself."

{¶ 11} Woodard testified that after throwing gravel in Maston's car she shut the car door and helped Patterson pick up a cell phone and keys in the parking lot. She and Patterson were facing each other and talking as they prepared to walk toward their own vehicle. At that point, she watched Carter exit Maston's car, reach over the passenger-side door, and fire the handgun.

{¶ 12} Patterson similarly testified that she was picking up items in the parking lot, including a purse, keys, and glasses, when she looked back and saw Carter on the other side of the car holding a handgun. Patterson testified that she heard Carter say, "man, f**k this," before firing the weapon three times. Patterson stated that no one was throwing

anything when she and Woodard were shot.

{¶ 13} Tyler also testified that Patterson and Woodard were doing nothing other than picking up items and proceeding to their own car when Carter shot them. Tyler watched as Carter "started firing" from the passenger's side of Maston's car.

{¶ 14} Finally, eyewitness Hall testified that she did not see where the two victims were when Carter shot them. She also did not see where Carter was when she fired the handgun.

{¶ 15} Following the presentation of evidence, the trial court provided the jury with relatively lengthy instructions on the law of self-defense. Defense counsel objected to the extent that they deviated in part from standard form Ohio Jury Instruction (OJI) self-defense instructions. The trial court overruled the objection.

{¶ 16} The jury found Carter guilty on two counts of felonious assault ("serious physical harm" and "deadly weapon") with firearm specifications as to each victim. Following merger of allied offenses, the trial court sentenced Carter on two counts of felonious assault and two firearm specifications. It imposed concurrent prison terms of two to three years for the felonious-assault convictions. It imposed three-year prison terms on each firearm specification and ordered those terms to be served consecutively to each other and consecutively to the concurrent felonious-assault sentences. The result was an aggregate prison term of eight to nine years. Carter appealed, advancing two assignments of error.

## II. Analysis

{¶ 17} The first assignment of error states:

**The Trial Court abused its discretion when it instructed the jury on self-defense and defense of another.**

{¶ 18} Although the trial court instructed the jury on self-defense and properly placed the burden on the State to disprove the claim beyond a reasonable doubt, Carter contends the trial court instructions were "confusing, inconsistent, and improper."

{¶ 19} Carter first challenges an instruction identifying five alternative ways the State could disprove self-defense. The instruction stated:

> * * * A person is allowed to use deadly force in self-defense. The State must prove beyond a reasonable doubt that the Defendant, when using deadly force, did not act in self-defense. To prove that the Defendant's use of deadly force was not in self-defense, the State must prove beyond a reasonable doubt at least one of the following: the Defendant was at fault in creating a situation giving rise to the shooting; or the Defendant did not have reasonable grounds to believe that she was in imminent or immediate danger of death or great bodily harm; or the Defendant did not have a honest belief, even if mistaken, that she was in imminent danger of death or great bodily harm; or the Defendant violated a duty to retreat to avoid the danger; or the Defendant used unreasonable force.

Trial Transcript Vol. II at 427.

{¶ 20} In challenging the foregoing instruction, Carter contends the duty to retreat has been removed from the elements of self-defense. Therefore, she claims a violation of that duty should not have been identified as a way to disprove self-defense. Carter

concedes that a jury still may consider the potential for "withdrawal" when a defendant is the initial aggressor. She maintains, however, that withdrawal by an initial aggressor involves a different issue than a more general duty to retreat to avoid danger. That being so, Carter argues that the duty to retreat should not have been mentioned and that withdrawal should have been addressed in the context of her potentially being an at-fault initial aggressor.

{¶ 21} Upon review, we find Carter's argument to be unpersuasive. After instructing the jury that violation of a duty to retreat was one way to disprove self-defense, the trial court gave the following additional instruction: "The Defendant had no duty to retreat before using force in self-defense if the Defendant was in a place in which she lawfully had the right to be." *Id.* at 429. The trial court also instructed the jury: "In determining whether the Defendant, in using force in self-defense, reasonably believed that the force was necessary to prevent injury, loss, or risk of life or safety, you may not consider the possibility of retreat by the Defendant." *Id.* These instructions accurately stated the law. *See* R.C. 2901.09(B) and (C).

{¶ 22} Having reviewed the entirety of the trial court's instructions, which the jury was presumed to have followed, we have no reason to believe that the jury rejected self-defense based on a finding that Carter violated a duty to retreat. Notably, the State did not present evidence or argument suggesting that self-defense was inapplicable because Carter violated a duty to retreat. The State did not claim Carter lacked a right to be in the parking lot. Therefore, the trial court's provision of accurate instructions on the issue, while perhaps unnecessary given the dearth of evidence that Carter was in the parking

lot unlawfully, was unlikely to have misled or confused the jury. *State v. Smith*, 2023-Ohio-3015, 223 N.E.3d 919, ¶ 53-54 (3d Dist.).

{¶ 23} With regard to Carter's argument that the trial court should have instructed the jury about "withdrawal" in the context of an at-fault, initial-aggressor defendant, that is precisely what the trial court did. It instructed the jury as follows:

> Defendant did not act in self-defense if the State proved beyond a reasonable doubt that the Defendant was at fault in creating the situation that resulted in the injury.
>
> The Defendant was at fault if the Defendant was the initial aggressor and one of the following apply: * * * Defendant did not withdraw from the situation; [or] the Defendant withdrew from the situation, but did not inform Jasmine Patterson and/or Jasmine Woodard or reasonably indicate by words or acts to Jasmine Patterson or Jasmine Wood of her withdrawal.

*Id.* at 428.

{¶ 24} We see nothing objectionable about the foregoing instruction, which again was a correct statement of the law. *See State v. Warth*, 1st Dist. Hamilton No. C-220477, 2023-Ohio-3641, ¶ 31 ("But R.C. 2901.09(C) is not an absolute prohibition on introducing evidence involving the possibility of retreat. Rather, the statute only prohibits fact finders from considering evidence involving the possibility of retreat to determine whether the defendant's belief that force was necessary was reasonable. Fact finders may, however, consider retreat evidence to determine who was at fault in creating the situation leading to the affray."); *State v. Hughkeith*, 2023-Ohio-1217, 212 N.E.3d 1147, ¶ 88 (8th Dist.)

("While a person no longer has a duty to retreat from a place he or she is lawfully permitted to be, there is no language in the amended statute to suggest a trier of fact is precluded from considering whether the defendant was the initial aggressor or whether the defendant attempted to withdraw from the situation when determining whether the defendant was at fault in creating the situation giving rise to the affray. The narrow language of the amended statute does not place on triers of fact express restrictions on consideration of fault."); *Smith* at ¶ 49 ("[A]s a general matter, if a person provokes or voluntarily enters a fight, that person can revive his or her right to self-defense by withdrawing from that altercation. It follows that a person generally cannot claim self-defense if that person provoked or voluntarily entered a fight and did not withdraw from the altercation.").

{¶ 25} Carter next challenges an instruction stating: "The Defendant did not act in self-defense if the State proved beyond a reasonable doubt that the Defendant used more force than reasonably necessary and the force used was greatly disproportionate to the apparent danger." Trial Transcript Vol. II at 429-430. Carter contends this instruction should not have been presented as a "separate option" to defeat self-defense but rather "as a consideration as to the second element of self-defense."

{¶ 26} We are unsure precisely what Carter means, and the cases she cites do not support the proposition that the trial court erred in giving an instruction regarding the use of more force than reasonably necessary and force that was greatly disproportionate to the danger. Carter appears to suggest that the trial court should have broken self-defense down into only two elements rather than five or even more in the present case. In *State*

*v. Nicholson*, Ohio Slip Opinion No. 2024-Ohio-604, __ N.E.3d __, however, the Ohio Supreme Court recently approved self-defense instructions quite similar to those given in Carter's case. In *Nicholson*, the trial court's instructions identified four elements of self-defense. *Id.* at ¶ 170. One of the four elements combined the need for the defendant to have an objectively reasonable belief and a true subjective belief that he was in immediate danger of death or great bodily harm. The trial court gave the same instructions in Carter's case except that it identified five elements of self-defense by instructing on the objectively reasonable and subjective beliefs separately. In *Nicholson*, the Ohio Supreme Court found nothing improper about the trial court dividing self-defense into four elements in its instructions and requiring the prosecution to disprove only one of them. *Id.* at ¶ 171. We reach the same conclusion in Carter's case, which involved substantially-similar instructions.

{¶ 27} As in the present case, the trial court in *Nicholson* also separately instructed the jury: "If the defendant used more force than reasonably necessary and if the force used is greatly disproportionate to the apparent danger, then the defense of self-defense is not available." *Id.* at ¶ 170. We see nothing improper about the trial court giving a substantially-similar instruction in Carter's case. Once again, this instruction was a correct statement of the law. *State v. Barker*, 2022-Ohio-3756, 199 N.E.3d 626 (2d Dist.), ¶ 28; *State v. Gray*, 2d Dist. Montgomery No. 26473, 2016-Ohio-5869, ¶ 8. It also was pertinent to the evidence presented.

{¶ 28} In her reply brief, Carter acknowledges that existing standard OJI instructions may not be "a correct statement of law" due to recent stand-your-ground

legislation and case law concerning a defendant's use of excessive or disproportionate force. She also recognizes that "case law supports the independent instructions" given by the trial court. She reasons, however, that when the trial court's instructions are "taken together" they become confusing and unclear. Having thoroughly examined the trial court's instructions on self-defense, we reject Carter's assertion that they were "confusing at best, if not improper," and that they deprived her of a fair trial.

{¶ 29} With regard to defense of another (her friend Maston), Carter simply references the self-defense arguments we rejected above and states: "Likewise, and for the same reasons, the trial court abused its discretion when it gave the jury instructions on the same five options that the State had to disprove Carter's defense of another claim." For the same reasons that the trial court did not err in instructing the jury on self-defense, we conclude that it did not err in providing substantially-similar instructions regarding defense of another. Accordingly, the first assignment of error is overruled.

{¶ 30} The second assignment of error states:

**The Manifest Weight of the Evidence Supported Carter's Self-Defense and Defense of Another Claims.**

{¶ 31} Carter contends her convictions were against the manifest weight of the evidence. She argues that the evidence supported a finding that she acted in self-defense and in defense of Maston. In particular, Carter asserts that she had no duty to retreat, that she was not at fault, and that she possessed an objectively reasonable and subjective fear of death or great bodily harm when she shot the victims. Carter contends she was being verbally threatened with violence, struck with large rocks, and prevented from

leaving when she fired the handgun. Under these circumstances, she asserts that a finding of no self-defense was against the weight of the evidence.

**{¶ 32}** When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 33}** "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61, 2013-CA-62, 2014-Ohio-3432, ¶ 24.

**{¶ 34}** With the foregoing standards in mind, we reject Carter's manifest-weight

challenge predicated on self-defense and defense of another. At a minimum, the jury reasonably could have concluded that she lacked an objectively reasonable belief that she or Maston was in imminent danger of death or great bodily harm when she shot the victims. Carter claimed that she was trapped, helpless, terrified, and blind when she fired the handgun in response to being verbally threatened and assaulted with large rocks.

{¶ 35} In contrast to Carter's version of events, the State's witnesses testified that all fighting had ceased when Carter fired the handgun. According to Williams, Patterson was bent over picking up glasses when Carter shot her in the buttocks. Williams testified that Carter was "by herself." Woodard similarly testified that she had shut Maston's car door after throwing gravel inside the car and that she was helping Patterson pick up objects. Patterson testified that no one was throwing anything when Carter fired the handgun. Patterson also heard Carter say, "man, f**k this", before firing the weapon. Tyler testified that Patterson and Woodard were doing nothing other than picking up items and proceeding to their own car when Carter shot them. A video introduced into evidence depicted Carter pacing back and forth with no one in her immediate vicinity just before the shooting. After entering the car, she exited again with a firearm, placed herself between the door and the car's frame, and fired three shots.

{¶ 36} We note too that the jury certainly could have found aspects of Carter's testimony to be not credible. Although she claimed to have feared for her life, she testified that she was "fed up" when she shot the victims. This testimony suggests anger or retaliation more than fear. Despite purportedly having been blinded by mace, Carter also claimed to have felt a loaded weapon with a chambered bullet in Maston's car. She then

managed to hit the victims with two of the three shots she fired, despite claiming that did not intend to hit them at all.

{¶ 37} Although the parties disputed what had occurred in the bar and during the protracted fight in the parking lot, the jury reasonably could have concluded based on the video evidence and the testimony of the State's witnesses that Carter and Maston were not in imminent danger of death or great bodily harm when Carter shot the victims. Consequently, the jury's finding of no self-defense and no defense-of-another was supported by the manifest weight of the evidence.

### III. Conclusion

{¶ 38} The judgment of the Montgomery County Common Pleas Court is affirmed.

. . . . . . . . . . . . .

EPLEY, P.J. and LEWIS, J., concur.